JUDGE BRODERICK 15 CV 02806

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

JOY MONFRIED

                             Plaintiff,                Civil Action No.

    -against-                                     **NOTICE OF REMOVAL**

SIGMA FINANCIAL CORPORATION AND
JEROME S. RYDELL

                         Defendants.

-------------------------------------------------------------X

RECEIVED
APR 10 2015
U.S.D.C. S.D. N.Y.
CASHIERS

TO:    THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR
       THE SOUTHERN DISTRICT OF NEW YORK

       Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants, SIGMA FINANCIAL
CORPORATION ("Sigma") and JEROME S. RYDELL ("Rydell") (hereinafter "defendants"),
hereby file this Notice of Removal of the above-captioned matter from the Supreme Court of the
State of New York, New York County, to the United States District Court for the Southern
District of New York. In support of the removal, Defendants respectfully state:

       1.   The Plaintiff, JOY MONFRIED ("Plaintiff"), commenced this action on or about
March 20, 2015.

       2.   The Summons and Complaint were served on Defendants by personal service on
March 24, 2015 outside the State of New York. This Notice of Removal is, therefore, being filed
within thirty days of service.

       3.   The Complaint alleges that Defendants recommended four failed tenant-in-
common or TIC private placement investments. (See Complaint, attached hereto as Exhibit A,
¶ 10).

4.   The Plaintiff is a resident of the State of New Hampshire.  (See Exhibit A, at ¶ 1).
At the time of the investments at issue, Plaintiff was a resident of the State of New Jersey.  (Id.).

5.   Sigma is a corporation organized under the laws of the State of Michigan and is
authorized to conduct business in the State of New York.  (See New York State Division of
Corporations, Entity Information, Exhibit B).  Its principal place of business is located in Ann
Arbor, Michigan.  (Id.).

6.   Jerome S. Rydell is a resident of the state of Florida.

7.   Plaintiff alleges in the Complaint that Sigma maintains an office in Hamburg,
New York, which is not in New York County.  (See Exhibit A, ¶ 6).  Plaintiff acknowledges in
the Complaint that Sigma is a corporation organized under the laws of the State of Michigan.
(See id., § 2).

8.   The amount in controversy in this action exceeds $75,000 as the Complaint
demands more than $7,000,000.  (See Exhibit A, ¶¶ 98, 109, 114, 121, 128 and 134).

9.   The United States District Court for the Southern District of New York has
original jurisdiction over this matter under 28 U.S.C. § 1332(a) in that there is diversity of
citizenship between Plaintiff and Defendants and the amount in controversy is in excess of
$75,000.

10. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §
1391, in that a defendant is subject to the Court's personal jurisdiction.

11. A true copy of this Notice of Removal has been filed with the New York State
Supreme Court, New York County, and served on all plaintiffs as provided by 28 U.S.C. §
1446(a).

Dated: New York, New York
       April 9, 2015

Mound Cotton Wollan & Greengrass

By: _____
Barry R. Temkin (BRT 4124)
Bradley D. Small (BS 0515)
*Attorneys for Defendants*
One New York Plaza
New York, New York 10004

Exhibit A

FILED: NEW YORK COUNTY CLERK 03/20/2015 01:55 PM INDEX NO. 650874/2015
NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 03/20/2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

JOY MONFRIED                                        : Index No: 650874-2015
                                                    : Date Purchased: 3/20/15
                              Plaintiff             :
                                                    : **SUMMONS**
        - against -                                 :
                                                    :
SIGMA FINANCIAL CORPORATION AND                     :
JEROME S RYDELL                                     :
                                                    :
                              Defendants.           :
-------------------------------------------------------------------X

**TO THE ABOVE NAMED DEFENDANTS:**

> **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

> The basis of venue is defendant, Sigma Financial Corporation's, designation of New York County as its county of residence with the New York State Secretary of State.

Dated: New York, New York
       March 20, 2015

                              FITAPELLI KURTA
                              By: _____
                                   Marc Fitapelli, Esq.
                              475 Park Avenue South, 12th Floor
                              New York, New York 10016
                              Tel No. (212) 658-1501
                              Fax No. (855) 348-2735

                              *Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-X

| | |
|---|---|
| JOY MONFRIED | : Index No: 350874-2015 |
| Plaintiff | : |
| | : **COMPLAINT** |
| - against - | : |
| | : |
| SIGMA FINANCIAL CORPORATION AND | : |
| JEROME S RYDELL | : |
| Defendants. | : |

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-X

Plaintiff, Joy Monfried ("Plaintiff") alleges as follows:

## PARTIES AND RELEVANT NON-PARTIES

1. Plaintiff is an individual and a resident of the state of New Hampshire. At the time the investments at issue in this case were initially made and solicited, Plaintiff was a resident of the State of New Jersey.

2. Defendant Sigma Financial Corporation ("Sigma") is a corporation organized under the laws of the State of Michigan and is authorized to conduct business in the State of New York. Defendant, Sigma, was at all times material hereto, a registered broker dealer with the Securities and Exchange Commission ("SEC") and a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"). Sigma maintains an office in the State of New York and continually and systematically transacts business in New York State.

3. Defendant, Jerome S. Rydell ("Rydell") is the President as well as an owner of Sigma. Accordingly, Rydell is a member of FINRA and is subject to its rules and regulations. Rydell is also a "control person" of Sigma. He exercises actual control of and derives substantial

revenues from the operation of Sigma and is liable for its acts.   Rydell has an astounding seventy-five (75) customer initiated complaints disclosed on his securities license.

4.     Non-party Christian Peter William Mirner was a registered representative of Sigma from November 2001 until April 2008, when he was terminated for "suspicion of selling unapproved products."   Following his employment with Sigma, Mr. Mirner was employed by a different broker-dealer where he was also terminated for "violating securities [laws] and [firm] policies regarding state license registrations."   Mr. Mirner made the initial investment recommendations to the Plaintiff.

5.     Non-party, Joral Schmalle, is a registered representative at Sigma and has been affiliated with the firm since January 2002.  After Mr. Mirner was terminated by Sigma in April 2008, Mr. Schmalle took responsibility for Plaintiff's investment and continued to advise her. Mr. Schmalle has twenty-six (26) customer-initiated complaints on his securities license.

## JURISDICTION AND VENUE

6.     This Court has personal jurisdiction over Sigma pursuant to CPLR 302(a) in that Sigma maintains an office in New York State in Hamburg, New York and continuously transacts business in New York State.

7.     Further, this Court has personal jurisdiction over Sigma pursuant to CPLR 301 because Sigma has registered as a foreign corporation doing business in the state of New York with the New York State Secretary of State.

8.     This Court has personal jurisdiction over Rydell pursuant to CPLR 302(a) because Rydell, a licensed securities broker is a licensed in the State of New York and continuously and systematically transacts business in the State of New York,

9.    Venue in this County is proper pursuant to CPLR 503(c) as Sigma, a foreign corporation, designated New York County as its county of residence with the New York Secretary of State's office.

## SUMMARY OF CASE

10.    This case involves the sale of four failed tenant-in-common or TIC private placement investments, which Defendants recommended to Plaintiff.    The investments were initially solicited in 2005 and involved various material misrepresentations and omissions, some of which are continuous and other which were only recently discovered by Plaintiff.

11.    Defendants were Plaintiff's broker-dealer and as such they had a legal obligation to not only conduct due diligence with respect to the investments at issue, but to recommend only appropriate and suitable investments to Plaintiff.

12.    Tenant-in-common interests are securitized private placement real estate investments that can be sold to investors for the purpose of deferring capital gains tax under Section 1031 of the IRS code.  The investments at issue were recommended to Plaintiff based upon the promise of consistent annualized cash-on-cash returns; however, the properties at issue ceased paying distributions and all but one were foreclosed upon.

## BACKGROUND

*TIC Investments*

13.    The term "tenants-in-common" or "TIC" refers to a fractional interest in an undivided real estate property.

14.    A TIC sponsor purchases the same types of commercial real estate property that real estate investment trusts ("REITs") REITs purchase, however unlike REIT investors, TIC

3

investors directly own a fraction of the property and assume a proportionate amount of the loan used to purchase the property.

15.    This means that TIC purchasers, including Plaintiff, become personally liable for considerable amounts of debt.

16.    TICs are sold through private placement offerings under SEC's Regulation D and, as such, TIC sponsors do not need to comply with the typical registration requirements of the Securities Act of 1933 that apply to most issuers of securities.   These requirements are designed to protect investors.

17.    TICs are also unique in that they qualify for tax-free, or like-kind, exchanges of property under Section 1031 of the IRS code of 1986.

18.    A "like-kind exchange," also known as a 1031 exchange, permits owners of investment property to defer capital gains tax upon the disposition of investment property if proceeds from the sale are re-invested in other investment property within specified time limits.

19.    Under Section 1031 of the Internal Revenue Code, a seller wishing to engage in a like-kind exchange has only 45 days from the sale of the original property to identify a "like-kind" replacement property and 180 days from the date of the sale to close on the purchase of the replacement property.  Due to the time limitations prescribed by the IRS, investors have a short amount of time to conduct due diligence on replacement properties and it is especially important to have a third party, such as a broker dealer, engage in this due diligence.

20.    Under a 2002 IRS Revenue Ruling (Rev. Ruling 2002-22), applicable to like-kind exchanges, investors are permitted to exchange singular interests in real property with TICs. This change resulted in a spike in TIC transactions in the early 2000's, which has continued to date.

4

*Inherent Problems with TICs*

21.     TICs suffer from the same problems as non-traded REITs: lack of liquidity, little price transparency, excessive fees and distributions that may be paid from offering proceeds or debt.

22.     However, unlike REITs, TIC investors remain personally liable on the debt for their investments and have considerable tax consequences in the event of a loss of their principal investment.

23.     Investors are induced into investing in TICs, including the ones at issue in this arbitration, in order to defer capital gains that may be realized from the sale of an investment property.

24.     While the marketing materials for TICs, including the ones at issue, emphasize that TIC investors can earn a steady income stream on the untaxed proceeds of their exchanges, much of the tax deferral is lost in upfront fees paid to the entities involved in the offering.

25.     According to FINRA Notice to Member 05-18, a broker must consider whether "the fees and expenses associated with TIC transaction outweigh the potential tax benefits to the customer.  TICs structured with high up-front fees and expenses paid to the sponsor and/or salespersons of the selling broker-dealers raise particular concerns about the ability to make a suitable recommendation."

26.     In this case, the high upfront and often undisclosed fees vitiated any potential tax deferral to Plaintiff, making the investments unsuitable on their face.

27.     TICs are also illiquid with no known secondary market according to FINRA.

5

28.     Finally, and most significantly, the private placement memorandum for the TICs improperly valued the properties as well as their income stream and the appraisals of the properties were materially misstated.

*FINRA's Guidance With Respect to TIC Investments*

29.     Plaintiff was a customer of Sigma and Sigma marketed and sold the investments at issue to Plaintiff.

30.     Defendants at all times were and are members of FINRA and are subject to its rules and guidelines with respect to the recommendation of certain investments to its customers.

31.     In March 2005, FINRA issued Notice to Member 05-18, "Private placements of Tenants-in-Common Interests," which warned of the dangers of TIC investments as well as the heightened need for proper broker-dealer due diligence (the "Notice to Member 05-18").

32.     Specifically, the Notice to Member 05-18 explains the obligation of a broker-dealer, such as Defendants, to undertake the following with respect to tenant-in-common interests:

- Conduct appropriate due diligence;

- Perform a reasonable-basis suitability analysis;

- Perform customer specific suitability analysis for recommended transactions;

- Ensure that promotional materials used by the member are fair, accurate and balanced;

- Implement appropriate internal controls; and

- Provide appropriate training to registered persons involved in the sale of these products.

33.     With respect to due diligence, the Notice to Member 05-18 provides as follows:

6

> NASD staff believes that it is not appropriate for members that recommend a TIC transaction simply to rely on representations made by the sponsor in an offering document…members should make a reasonable investigation to ensure that the offering document does not contain false or misleading information. Such an investigation could include background checks of the sponsor's principals, review of the agreement…In addition, if the offering document contains projections, members should understand the basis for those projections, and the degree of likelihood that they will occur.

34.     With respect to suitability, the Notice to Member 05-18 provides:

> In many cases, a TIC interest will constitute a significant portion of an investor's total assets. Because of the favorable tax treatment, investors often elect to invest the entire proceeds from the sale of an investment property in a TIC exchange. Concentration of an investor's assets in a single asset class, however, is not suitable for many investors. Members must, with respect to each customer for whom they make a recommendation, consider the risks from over-concentration against the benefits of tax deferral and the investment potential of the underlying real estate asset(s).

35.     In this case, Defendants failed to exercise any independent judgment or skepticism with respect to the investments at issue, relying solely on the private placement memorandums issued by the sponsors of each investment, which contained various material misstatements and omissions.

36.     Defendant, Rydell, by virtue of his position as a supervisory had an independent legal obligation to supervise the activities of Sigma's employees to ensure compliance with the foregoing guidelines. Rydell failed to ensure such compliance.

7

*Investments at Issue*

37. In or about the summer of 2005, Plaintiff was induced by Defendants to invest in the following TICs:

| TIC | Cash Invested | Loss Event |
| --- | --- | --- |
| 6610 Cabot Drive, Glen Burnie, MD | $305,800.00 | Interest was diluted in 2014 and distributions were also reduced in 2014. |
| 6401 Golden Triangle Drive, Greenbelt, MD | $425,000.00 | Property foreclosed in April, 2010. |
| 900 Ashwood Parkway, Atlanta, GA | $310,000.00 | Property was foreclosed upon on June 5, 2012. |
| 3711 Medical Drive, San Antonio, TX | $195,200.00 | Bankruptcy and foreclosure filed in 2012. |

*Misrepresentations/Omissions Common to all Investments*

38. The following are material misrepresentations and/or omissions made by Defendants in connection with the offer and sale of the investments at issue:

a. Defendants failed to warn Plaintiff that she was investing in jurisdictions that adopted non-judicial foreclosure laws, which would make the foreclosure process considerably more difficult to defend.

b. Defendants failed to warn Plaintiff that the investors of the TICs, including Plaintiff, may be responsible for future capital calls in the event the properties cannot meet cash need.

c. Defendants failed to warn Plaintiff that the fees and expenses paid in connection with each property vitiated the potential tax deferral.

d. Defendants failed to warn Plaintiff of the tax risks associated with a foreclosure of the properties and the tax treatment of "forgiven" recourse and non-recourse loans.

8

e. Defendants failed to warn Plaintiff both that the underlying loans for the properties would be securitized and sold on the secondary market.

f. Defendants failed to warn that leases and loan documents could be modified in the future without Plaintiff's consent.

g. Plaintiff was never provided copies of the underlying leases by Defendants.

h. Defendants represented that the properties in question would yield a consistent rate of return.

i. Defendants failed to advise Plaintiff of the litigation and foreclosure histories of the companies that issued the TICs in question.

j. Defendants failed to warn Plaintiff that the properties could be controlled and dominated by management companies owned by the issuer of the investments.

k. Defendants failed to disclose the identity and creditworthiness of the other individuals and corporations who would own the properties in question with Plaintiff.

39.    Sigma, by virtue of its role as broker-dealer, was legally obligated to advise Plaintiff of these risks and was require reviewing and vetting each investment by, among other things hiring a third-party due diligence expert, reviewing the private placement memorandum and documents regarding the sponsors and advising of all material risks regarding the investments.

*Golden Triangle*

40.    In or about March, 2005, Plaintiff was induced by Sigma to invest approximately $425,000.00 into a real estate private placement offering known as 6401 Golden Triangle, Greenbelt, Maryland ("Golden Triangle").

41.     Plaintiff invested in Golden Triangle through the creation of a special purpose limited liability company.

42.     In addition to the cash investment, Plaintiff also assumed a pro-rata amount of the underlying financing.

43.     For the reasons discussed in the foregoing paragraphs, Defendants had a legal obligation to Plaintiff to review and conduct due diligence on Golden Triangle.

44.     In addition to this representation, a confidential private placement memorandum, as well as a subsequent amendment, was provided to both Plaintiff and Defendant, which outlined the material risks of the investment in Golden Triangle (the, "Golden Triangle PPM").

45.     Significantly, the Golden Triangle PPM did not contain a copy of the debt instrument that Plaintiff would be assuming as part of the investment.   Rather, the Golden Triangle PPM contained a one page exhibit annexed to it, which purported to contain the material terms of the underlying loan for Golden Triangle, which would be assigned to Plaintiff and the other investors at closing.

46.     The omission of the actual loan documents as an exhibit is a material omission in itself.

47.     More important, however, the underlying loan documents for Golden Triangle contained several unusual provisions, the omission of which in the exhibit was material.

48.     For example, the Golden Triangle loan agreement permitted the lender to appoint a receiver upon default "without notice and without regard to the adequacy of security for the indebtedness secured."

49.     Moreover, the promissory note granted the lender the right to a confession of judgment in the state of Maryland in the event of a default. The existence of this right was omitted from the Golden Triangle PPM.

50.     Defendants had a legal obligation to not only review the Golden Triangle PPM, but to question its contents and to uncover any material misstatements or omissions, such as the contents of the loan documents.

51.     Plaintiff had no reason to believe that these provisions neither existed in the underlying loan documents nor was Plaintiff ever provided with a copy of the actual loan documents.

52.     The underlying loan for Golden Triangle matured on January 1, 2010.

53.     On April 10, 2010, the senior lender, State Farm Life initiated an action in Federal Court in the District of Maryland for, among other things, the appointment of a receiver.

54.     The litigation with the lender was eventually settled and Plaintiff lost her entire investment in Golden Triangle.

*Griffin Capital (Ashwood-Southfield)*

55.     In or about May 3, 2005, Plaintiff was induced by Sigma to invest $620,000.00 in a tenant-in-common investment, which owned two properties, 900 Ashwood Parkway, Atlanta, Georgia and 25510 West 11 Mile Road, Southfield, Michigan 4034 ("Griffin Ashwood").

56.     The private placement memorandum for Griffin Capital (the "Griffin PPM") contains a description of the underlying $38,600,000 loan provided by JPMorgan Chase Bank, as lender.

57.     In addition to the cash investment, Plaintiff also assumed debt in the amount of $1,124,881.

11

58.    Significantly, while the Griffin PPM warns that foreclosure is a risk, never advises the Plaintiff that both the states of Georgia and the state of Michigan are jurisdictions that both permit non-judicial foreclosures.

59.    The materiality of this risk came to fruition in June 29, 2012, when a non-judicial foreclosure was filed with respect to Griffin Ashwood and Plaintiff lost her entire interest in Griffin Ashwood.

60.    In addition to the foregoing, the Griffin PPM stated that no independent appraisal of Griffon Ashwood was conducted.

61.    In the absence of a formal appraisal, Plaintiff reasonably relied on a representation from Sigma that the value of Griffon Ashwood was approximately $60,000,000. This valuation was false.

62.    Plaintiff, who has no knowledge of either the Atlanta or Detroit real estate markets reasonably relied on Sigma's valuation.

63.    Plaintiff only learned of the falsity of this valuation during the foreclosure of Griffon Ashwood.

*Cabot Drive*

64.    On or about January 31, 2005, Sigma induced Plaintiff to invest approximately $305,688 into a TIC, which would own 6610 Cabot Drive, Glen Burnie, Maryland ("Cabot Drive").

65.    In addition to the cash investment, Plaintiff also assumed debt equal to $506,900.

66.    The private placement memorandum for Cabot Drive (the "Cabot PPM") contains a description of the market conditions in Baltimore and Cecil County, Maryland. Cabot Drive,

12

however, was not located in Baltimore and was located in Anne Arundel County, Maryland, a suburb outside of Baltimore.

67.     Sigma failed to advise Plaintiff of this material omission and relied on these inaccurate assumptions when Sigma prepared financial assumptions for Plaintiff.

68.     Sigma also failed to advise Plaintiff that she would be responsible for capital calls in the event that Cabot Drive needed additional capital.

69.     Sigma further failed to advise Plaintiff that her interest in Cabot Drive would be diluted in the event that Plaintiff could not afford a capital call.

70.     This risk come to fruition in 2014, when Plaintiff was unable to afford a capital call to save the property and Plaintiff's interest in Cabot Drive was diluted.

*Medical Drive*

71.     In or about 2005, Sigma induced Plaintiff to invest $195,200 into a "TIC" investment known as 3177 Medical Drive, San Antonio, TX ("Medical Drive").

72.     The investment in Medical Drive is unique among all three investments because Plaintiff did not directly own a proportion of fee title in Medical Drive, but owned an interest in a Delaware statutory trust, which in turn owned Medical Drive.

73.     An investment in a Delaware statutory trust (a "DST") carried unique risks which the IRS mandates in order to treat the investment as tax deferred under IRS Section 1031.

74.     Sigma failed to advise Plaintiff of any of these risks.

75.     Specifically, Sigma failed to advise Plaintiff that an investment in a DST required Plaintiff to give complete control to a third party trustee, who was an affiliate of the sponsor of the investment at issue.

13

76.    Further, the DST limited the trustee's liability to Plaintiff to acts arising from "gross" negligence, making it difficult to pursue any claims against the trustee.

77.    The IRS also mandated that DSTs are not permitted to re-invest equity in Medical Drive or to re-negotiate portions of the underlying loan.

78.    In addition, the investment in Medical Drive was fully leased to a holding company, which in turn collected rents from the individual tenants.

79.    It was represented to Plaintiff by Sigma that this holding company was a highly credit worthy tenant and that it would insulate Plaintiff from market fluctuations.

80.    This was false as the holding company was actually nothing more than an under-capitalized shell.

81.    Eventually, as a result of poor cash flows, a foreclosure of Medical Drive was complete in 2014 and Plaintiff lost her entire interest.

82.    Plaintiff only learned of the falsity of Defendants' representations in 2014 during the foreclosures and in 2015 when Plaintiff retained counsel.

*Plaintiff's Agents Instruct Plaintiff Not to Sue*

83.    Following the initial investments in 2005, Plaintiff was advised by Defendants and Mr. Mirner, specifically, who provided continuous counsel on the properties at issue.

84.    Eventually, Mr. Mirner was terminated by Sigma in November 2008. Following his termination Plaintiff communicated with Joral Schmalle of Sigma regarding her investments.

85.    Mr. Schmalle would communicate with the Plaintiff to provide advice and counsel with respect to the properties, including the prospect of retaining counsel.

86.    By way of example only, in an April 13, 2009 email, Mr. Schmalle discouraged the Plaintiff, as well as other investors, from seeking legal counsel to pursue claims related to

14

their losses in the properties, arguing "... suing does not make financial sense & we should focus on improving the terms of the agreement."

87.    Further, Mr. Schmalle and Sigma also advised Plaintiff that the sponsor's did not do anything wrong and that pursuing claims against the sponsors would not be successful.

88.    These representations were false.

89.    Plaintiff, who is not an attorney, reasonably relied on the counsel of Sigma and only sought legal counsel after the properties in question were foreclosed upon.

90.    In addition to counseling Plaintiff and other investors not to sue, Defendants continued to advise Plaintiff with respect to her management of the investments years after the initial investments were made.

## PLAINTIFF'S CAUSES OF ACTION
## AS FOR THE FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duties)

91.    Plaintiff incorporates by reference, as if fully reiterated herein, the allegations contained above.

92.    Defendants were responsible for the investment of the assets of the Plaintiff and acted as fiduciaries by virtue of their membership in FINRA and their relationship with Plaintiff.

93.    Defendants breached this duty, by among other things, failing to conduct adequate due diligence on this investments at issue and advising Plaintiff to enter into unsuitable investments.

94.    Specifically, the investments were unsuitable to Plaintiff because of their illiquid nature and high risk.

95.    Due to Defendants efforts to conceal and hide their wrongful conduct, Plaintiff was unable to initially discover their breached.

15

96.     Defendants continued to breach this duty by discouraging Plaintiff from seeking legal counsel after the investments started suffering cash flow problems.

97.     Defendants further continued this breach by continuously advising Plaintiff, years after the investments were made, about how best to manage the investments at issue.

98.     Plaintiff has been and continues to be damaged by Defendants' breaches of their fiduciary duties in an amount of no less than $1,300,000.00.

## AS FOR THE SECOND CAUSE OF ACTION
### (Unjust Enrichment)

99.     Plaintiff incorporates by reference, as if fully reiterated herein, the allegations contained above.

100.    Substantial benefits in the form of commissions have been conferred on Defendants by Plaintiff and Defendants have appreciated these benefits.

101.    Defendants' acceptance and retention of these benefits under the circumstances make it inequitable for Defendants to retain the benefits without payment of their value to Plaintiff.

102.    Defendants, by their bad faith and deliberate and fraudulent misconduct complained of herein, have been unjustly enriched in a manner that warrants restitution to Plaintiff of the commissions received by Defendants.

103.    Equity would not permit Defendants to retain such benefits.

104.    Plaintiff has been and continues to be damaged by virtue of Defendants' unjust enrichment in an amount to be determined at trial.

## AS FOR THE THIRD CAUSE OF ACTION
### (Negligence)

105.    Plaintiff incorporates by reference, as if fully reiterated herein, the allegations contained above.

16

106.   The Defendants had a duty to provide investment recommendations to Plaintiff in a careful, competent and reasonable manner pursuant to the rules and guidelines of FINRA.

107.   The Defendants breached their duty to Plaintiff by, among other things, failing to competently and prudently review the risks of the investments at issue.

108.   As a direct and proximate result of the Defendant's breach of this duty, Plaintiff has suffered injury.

109.   As a result of the foregoing, Plaintiff has suffered damages in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon.

## AS FOR THE FOURTH CAUSE OF ACTION
### (Common Law Fraud)

110.   Plaintiff incorporates by reference, as if fully reiterated herein, the allegations contained above.

111.   As discussed above, the Defendants made numerous representations to Plaintiff regarding the investment in the TICs in question.

112.   Defendants' representations were made with knowledge of their falsity and/or with disregard and recklessness as to truth or falsity and were made with the intent to mislead Plaintiff in reliance thereupon.

113.   Defendants' representations were material to persuading Plaintiff to invest in the TICs and Plaintiff reasonably and justifiable relied upon such representations in making their investments.

114.   As a result of the foregoing, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon.

## AS FOR THE FIFTH CAUSE OF ACTION
### (Aiding and Abetting Fraud)

115.   Plaintiff incorporates by reference, as if fully reiterated herein, the allegations contained above.

116.   As set forth above, issuers of the investments at issue committed fraud on Plaintiff, but making material misrepresentations and/or omissions in the private placement memorandums for the investments at issue.

117.   Defendants knew or should have known of the investment sponsor's fraud upon Plaintiff.

118.   Defendants knew or should have known that the investment sponsors were supplying them with materially false information, which the Defendants provided directly to the Plaintiff.

119.   By doing so, the Defendants acquiesced in, and permitted such fraud by the investment sponsors upon Plaintiff.

120.   Further, the Defendants substantially assisted and participated in the fraud by knowingly permitting and actively assisting the dissemination of materially false information related to the investments that were relied on by Plaintiff.

121.   As a result of the foregoing, Plaintiff has and continues to suffer damages in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon.

## AS FOR THE SIXTH CAUSE OF ACTION
### (Violation of the New Jersey Uniform Securities Law)

122.   Plaintiff incorporates by reference, as if fully reiterated herein, the allegations contained above.

123.   Plaintiff was a New Jersey resident at the time of the investments at issue.

18

124.   The tenant-in-common interests sold to Plaintiff constituted a security under the New Jersey Securities Act, N.J.S.A. 49:3-47, *et seq.*

125.   The false statements and actions of Defendants in connection with the sale of the TICs and Defendants' subsequent conduct constitute a violation of the New Jersey Uniform Securities Law and/or the rules and regulations promulgated thereunder.

126.   Specifically, Defendants are in violation of and breached their duties under NJSA 49:3-52 by defrauding Plaintiff, making untrue statements of material fact, and omitting statements of material facts necessary to make statements not misleading.

127.   Defendant, Rydell, was a control person within the meaning of N.J.S.A. 49:3-71(b) and, therefore, is joint and severally liable with Sigma to Plaintiff for damages.

128.   By reason of Defendants' willful and wanton misconduct, including the fraudulent misrepresentations, material omissions and deceptive conduct described above, and Plaintiff's reasonable and justifiable reliance thereon to her detriment, Plaintiff is entitled to recover the consideration paid for the security and any loss due to such advice, which sum shall be no less than $1,300,000, in addition to interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey.

### AS FOR THE SEVENTH CAUSE OF ACTION
**(Fraud in the Inducement)**

129.   Plaintiff incorporate by reference, as if fully reiterated herein, the allegations contained above.

130.   In order to induce Plaintiff to invest in the TICs, Defendants made false, affirmative representations and intentional omissions of material facts regarding the nature of the investment in connection with the solicitation of Plaintiff and Plaintiff's investment.

131.   Plaintiff reasonably relied on said representations in deciding to invest and subscribe to the investments, only to subsequently discovery many years later when the properties were foreclosed upon that said representations were false and misleading.

132.   Defendants made the misrepresentations and material omissions with knowledge they were false and misleading and/or with reckless indifference to the truth.

133.   Defendants made the misrepresentations and material omissions with the intention that Plaintiff be deceived and rely thereon, in order to induce Plaintiff to invest and subscribe to the investments.

134.   As a result of the foregoing, Plaintiff has and continues to suffer damages in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon.

WHEREFORE, Plaintiff demands judgment as follows:

(a)   On the First Cause of Action, in favor of Plaintiff and against the Defendants, joint and severally, in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon;

(b)   On the Second Cause of Action, in favor of Plaintiff and Defendants, joint and severally, in an amount to be determined at trial, but in no event less than the minimal jurisdictional threshold of this Court;

(c)   On the Third Cause of Action, in favor of Plaintiff and against the Defendants, joint and severally, in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon;

(d)   On the Fourth Cause of Action, in favor of Plaintiff and against Defendants, joint and severally, in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon;

    (e)     On the Fifth Cause of Action, in favor of Plaintiff and against the Defendants, joint and severally, in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon;

    (f)     On the Sixth Cause of Action, in favor of Plaintiff and against the Defendants, joint and severally, in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon pursuant to the New Jersey Uniform Securities Act;

    (g)     On the Seventh Cause of Action, in favor of Plaintiff and against the Defendants, joint and severally, in an amount to be determined at trial, but in no event less than $1,300,000.00 plus interest thereon;

    (h)     For Plaintiff's costs and disbursements in this action, including their reasonable attorneys' fees; and

    (i)     For such other and further relief as the Court deems just, equitable and proper.

Dated: New York, New York
       March 20, 2015

                        Respectfully submitted,

                        FITAPELLI KURTA

                        By_____
                           Marc Fitapelli, Esq.
                           Jonathan Kurta, Esq.
                        475 Park Avenue South, 12th Floor
                        New York, New York 10016
                        Phone: (212) 658-1501
                        Fax: (855) 348-2735

                        Attorneys for Plaintiff

EXHIBIT B

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through March 26, 2015.

Selected Entity Name: SIGMA FINANCIAL CORPORATION

Selected Entity Status Information

**Current Entity Name:** SIGMA FINANCIAL CORPORATION

**DOS ID #:** 2086288

**Initial DOS Filing Date:** NOVEMBER 20, 1996

**County:** NEW YORK

**Jurisdiction:** MICHIGAN

**Entity Type:** FOREIGN BUSINESS CORPORATION

**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

SIGMA FINANCIAL CORPORATION
4261 PARK RD
ANN ARBOR, MICHIGAN, 48103

http://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_nameid=2138975&p_corpid=2098288&p_entity_name=%53%69%67%6D%61%20%46%69%6E%61%6E%63%69%61%6C%20%43%6F...

## Chief Executive Officer

JEROME RYDELL
300 PARKLAND PLAZA
ANN ARBOR, MICHIGAN, 48103

## Principal Executive Office

SIGMA FINANCIAL CORPORATION
300 PARKLAND PLAZA
ANN ARBOR, MICHIGAN, 48103

## Registered Agent

C T CORPORATION SYSTEM
1633 BROADWAY
NEW YORK, NEW YORK, 10019

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

## *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

## Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| NOV 20, 1996 | Actual | SIGMA FINANCIAL CORPORATION |

Entity Information

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us