UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

JOY MONFRIED,

          Plaintiff,                            Case No: 2:16-cv-12170 BAF-EAS

v.                                              Hon. Bernard A. Friedman

SIGMA FINANCIAL CORPORATION       Magistrate Judge Elizabeth A. Stafford
AND JEROME S. RYDELL,

          Defendants.                           **DEFENDANTS' MOTION TO
                                                DISMISS AND BRIEF IN SUPPORT**

---

Fitapelli Kurta                        Saretsky Hart Michaels & Gould PC
Attorneys for Plaintiff                Attorneys for Defendants
By: Jonathan Kurta                     By:  Gary M. Saretsky P31708
     jkurta@fkesq.com                       gsaretsky@saretsky.com
28 Liberty Street, 30th floor               Janine M. Lucas P66352
New York, NY  10005                         jlucas@saretsky.com
212-658-1501                           995 South Eton
                                       Birmingham, Michigan 48009
                                       248-502-3300

---

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) AND MEMORANDUM IN SUPPORT

Now Come Defendants, Sigma Financial Corporation ("Sigma") and Jerome

S. Rydell ("Rydell") (collectively "Defendants"), by and through their attorneys

Saretsky Hart Michaels & Gould PC, and for their Motion to Dismiss Pursuant to

Fed. R. Civ. P. 12(b)(6) and Memorandum in Support state:

1.      Plaintiff, Joy Monfried ("Plaintiff"), initiated a business relationship with securities broker-dealer, Sigma, and its registered representative, Christian Mirner ("Mirner"), in late 2004 for the purpose of gaining access to real estate securities that would allow Plaintiff to defer the payment of capital gains tax on the sale of Plaintiff's investment real estate.

2.      Between January 2005 and March 2005, Plaintiff allocated the proceeds from the sale of her prior investment real estate into four replacement properties which she purchased directly from the investment sponsors.

3.      The transactions were brokered by Sigma and Mirner for a one-time commission. Their role was complete once the transactions were consummated.

4.      Rydell had no involvement with Plaintiff or any of Plaintiff's investments.

5.      The investments did not perform to Plaintiff's expectations.

6.      In March 2015 – a decade later – Plaintiff filed a complaint ("Complaint") against Sigma and its President, Rydell (collectively "Defendants"), accusing them and Mirner of wrongdoing in connection with the transactions.

7.      Specifically, Plaintiff alleges that (1) Mirner made unsuitable investment recommendations, (2) Mirner made material misrepresentations and/or omissions which induced Plaintiff to make the investments, (3) Rydell is liable for Mirner's alleged misrepresentations and/or omissions as a purported control person under the New Jersey Uniform Securities Law; (4) Defendants are liable for

2

alleged misrepresentations and/or omissions in offering materials prepared by third-party investment sponsors, and (5) Sigma failed to conduct due diligence before offering the investments for sale.

8.      The Complaint fails for a number of reasons and is, therefore, subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

9.      First, all of the claims are barred by the statutes of limitation – by a matter of years.

10.     Second, Plaintiff's efforts to avoid the preclusive effect of the statutes of limitation are legally insufficient.

11.     Third, Plaintiff cannot establish reliance as a matter of law in order to state a claim of fraud where the offering materials provided to Plaintiff disclosed all of the information Plaintiff alleges was misrepresented or omitted by Defendants and/or Mirner.

12.     Fourth, Plaintiff fails to allege facts to establish that Rydell "materially aided" Mirner's purported fraud such that Rydell is personally liable as a "control person" under the New Jersey Uniform Securities Law.

13.     Fifth, Defendants are not liable for alleged fraudulent misrepresentations or omissions in offering materials authored by third-party investment sponsors over which Defendants have no control.

14.     Sixth, Plaintiff fails to allege facts sufficient to establish the existence of a fiduciary relationship between her and Defendants and/or Mirner.

3

15.     Finally, Plaintiff fails to allege facts sufficient to establish causation between the alleged wrongful acts by Defendants and/or Mirner and her claimed losses.

16.     Pursuant to L.R. 7.1, counsel for Defendants conferred with counsel for Plaintiff prior to filing this motion. The parties were unable to resolve all or any of the issues raised in the motion.

Wherefore, for the reasons stated herein and in the following memorandum in support, Defendants move for dismissal of Plaintiff's Complaint with prejudice.

Dated: September 22, 2016          Respectfully submitted,

                                  SARETSKY HART MICHAELS & GOULD PC
                                  Attorneys for Defendants

                          By:     /s/Janine M. Lucas
                                  Gary M. Saretsky P31708
                                  gsaretsky@saretsky.com
                                  Janine M. Lucas P66352
                                  jlucas@saretsky.com
                                  995 S. Eton
                                  Birmingham, MI 48009
                                  (248) 502-3300
                                  (248) 502-3301 (fax)

## MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

CONCISE STATEMENT OF ISSUES PRESENTED ............................................ ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iii

I.    INTRODUCTION ............................................................................... 1

II.   STATEMENT OF FACTS ................................................................ 4

III.  ARGUMENT ..................................................................................... 11

    A.    Standard of Decision ............................................................ 11

    B.    Plaintiff's Claims Are Barred by the Statutes of Limitation .............. 12

        1.    The Nature and Purpose of Statutes of Limitation ................... 12

        2.    The Applicable Law ................................................................. 13

        3.    Plaintiff's Claims are Governed by Two, Three and Six Year Limitations Periods ........................................................ 14

        4.    Plaintiff's Claims Accrued No Later than the Date of Investment ................................................................................. 15

        5.    There Are No Grounds for Tolling or Extending the Limitations Periods ................................................................. 16

        6.    Plaintiff Cannot Invoke Equitable Estoppel to Bar the Statute of Limitations Defense ............................................... 26

    C.    Plaintiff Cannot Establish Reliance As a Matter of Law ................... 30

    D.    Defendants Are Not the "Makers" of the Statements in the Offering Materials and, Thus, Not Subject to Liability for Same ...... 48

    E.    Rydell Is Not Liable as a Control Person Under the New Jersey Uniform Securities Law .................................................... 50

    F.    Defendants Were Not Plaintiff's Fiduciaries ...................................... 51

    G.    Plaintiff Fails to Allege Facts to Establish Causation ........................ 55

i

IV.   CONCLUSION.............................................................................................59

## CONCISE STATEMENT OF ISSUES PRESENTED

I.    Whether Plaintiff's claims which arise out of alleged misconduct that pre-dates investments Plaintiff made in early 2005 are time-barred by the applicable statutes of limitation.

II.   Whether Plaintiff's allegation that a registered representative of Defendant Sigma dissuaded Plaintiff from asserting claims against a third-party investment sponsor is sufficient to estop Defendants from asserting the defense of the statute of limitations.

III.  Whether Plaintiff can establish reasonable reliance on alleged oral misrepresentations or omissions regarding the investments at issue where the written offering materials that Plaintiff admits to receiving prior to the investments contradict those misrepresentations and omissions and where Plaintiff affirmed in a signed writing that she relied solely on the written offering materials and not on any statements outside those materials.

IV.   Whether Plaintiff states a claim for control personal liability under the New Jersey Uniform Securities Law against Rydell where Rydell did not "materially aid" Mirner's alleged fraudulent conduct, and, in fact, had no involvement whatsoever with Plaintiff or the transactions at issue.

V.    Whether Plaintiff states a claim for fraud against Defendants based on alleged misrepresentations and omissions in written offering materials where Defendants did not prepare the materials or have any control over their content.

VI.   Whether the Complaint states a claim for breach of fiduciary duty where Defendants never had control over Plaintiff's assets and where the investments at issue were non-discretionary and were purchased from and held by third-party investment sponsors and not by Defendants.

VII.  Whether any claim is sufficiently pled where the Complaint fails to include any factual allegations to establish causation between the alleged misconduct and Plaintiff's claimed investment losses.

iii

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

## Cases

*1031 Lapeer LLC v. Rice*,
  290 Mich. App. 225, 810 N.W.2d 293 (2010)................................................. 18, 31

*Abbo v. Wireless Toyz Franchise, L.L.C.*,
  No. 304185, 2014 WL 2515174 (Mich. Ct. App. May 13, 2014).......................34

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
  528 F.3d 426 (6th Cir. 2008) ......................................................................... 4, 37

*Bastian v. Petren Res. Corp.*,
  892 F.2d 680 (7th Cir. 1990) .............................................................................56

*Berry v. Main St. Bank*,
  977 F. Supp. 2d 766 (E.D. Mich. 2013) ............................................................17

*Butala v. Agashiwala*,
  916 F. Supp. 314 (S.D.N.Y. 1996) ....................................................................26

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997) .............................................................................56

*Carlucci v. Han*,
  886 F. Supp. 2d 497 (E.D. Va. 2012) ................................................................26

*Cent. States Joint Bd. v. Cont'l Assur. Co.*,
  117 Ill. App. 3d 600, 453 N.E.2d 932 (1983).....................................................34

*CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*,
  589 F.3d 235 (6th Cir. 2009) .............................................................................14

*CSI Inv. Partners II, L.P. v. Cendant Corp.*,
  180 F. Supp. 2d 444 (S.D.N.Y. 2001) ...............................................................26

*CTS Corp. v. Waldburger*,
  134 S. Ct. 2175, 189 L. Ed. 2d 62 ................................................................ 12, 13

*D.E.&J Ltd. P'ship v. Conaway*,
  284 F. Supp. 2d 719 (E.D. Mich. 2003) ............................................................56

iv

*Davis v. Keyes*,
  859 F. Supp. 290 (E.D. Mich. 1994) ...................................................52

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
  523 F.2d 389 (6th Cir. 1975) ............................................................24

*Egerer v. Woodland Realty, Inc.*,
  556 F.3d 415 (6th Cir. 2009) ....................................................... 27, 29

*Elec. Power Bd. of Chattanooga v. Monsanto Co.*,
  879 F.2d 1368 (6th Cir. 1989) ..........................................................13

*Exch. Comm'n v. Washington Cty. Util. Dist.*,
  676 F.2d 218 (6th Cir. 1982) ............................................................36

*Executone Bus. Sys. Corp. v. IPC Commc'ns, Inc.*,
  177 Mich. App. 660, 442 N.W.2d 755 (1989)....................................15

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ...............................................................57

*Fuller v. GEICO Indem. Co.*,
  309 Mich. App. 495, 872 N.W.2d 504 (2015)....................................27

*Garg v. Macomb Cty. Cmty. Mental Health Servs.*,
  472 Mich. 263, 696 N.W.2d 646 (2005)................................. 20, 21, 22

*Harner v. Prudential Sec. Inc.*,
  785 F. Supp. 626 (E.D. Mich. 1992) ..................................................31

*High Tides, LLC v. DeMichele*,
  88 A.D.3d 954, 931 N.Y.S.2d 377 (2011) ..........................................19

*Huhtala v. Travelers Ins. Co.*,
  401 Mich. 118, 257 N.W.2d 640 (1977)..............................................15

*In re Donald J. Trump Casino Sec. Litig.*,
  793 F. Supp. 543 (D.N.J. 1992) .........................................................19

*In re Ferro Corp. Derivative Litig.*,
  511 F.3d 611 (6th Cir. 2008) ............................................................12

*In re Merrill Lynch Ltd. Partnerships Litig.*,
  7 F. Supp. 2d 256 (S.D.N.Y. 1997) .................................................................26

*In re Sallee*,
  286 F.3d 878 (6th Cir. 2002) ...........................................................................51

*Isley v. Capuchin Province*,
  878 F. Supp. 1021 (E.D. Mich. 1995) ..............................................................13

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011) ...............................48

*Kayser v. Green Tree Servicing, LLC*,
  No. 12-CV-14901, 2013 WL 4613534 (E.D. Mich. Aug. 29, 2013) ........... 12, 37

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
  108 F.3d 1531 (2d Cir. 1997) ...........................................................................47

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  461 F. Supp. 951 (E.D. Mich. 1978) ........................................................... 51, 52

*Lozano v. Montoya Alvarez*,
  134 S. Ct. 1224, 188 L. Ed. 2d 200 (2014).......................................................13

*Massey v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of
  Am.*,
  462 F. Supp. 2d 780 (E.D. Mich. 2006) ............................................................22

*McGillen v. Amex Assurance Co.*,
  No. 08-12863-BC, 2008 WL 5235919 (E.D. Mich. Dec. 15, 2008) ....................4

*McIntyre's Mini Computer Sales Grp., Inc. v. Creative Synergy Corp.*,
  644 F. Supp. 580 (E.D. Mich. 1986) .................................................................17

*Mercantile Bank of Michigan v. CLMIA, LLC*,
  No. 316777, 2015 WL 630259 (Mich. Ct. App. Feb. 12, 2015) .........................52

*Moyer v. Comprehensive Rehab. Ctr., Inc.*,
  No. 292061, 2010 WL 3604680 (Mich. Ct. App. Sept. 16, 2010) .....................22

*Oliverio v. Nextel W. Corp.*,
  No. 13-10296, 2013 WL 2338706 (E.D. Mich. May 29, 2013)..........................34

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ...................................................................47

*Pecon SA v. Chicago Research & Trading Grp., Ltd.*,
   No. 92 C 7013, 1993 WL 390213 (N.D. Ill. Oct. 1, 1993)...................................26

*Phinney v. Perlmutter*,
   222 Mich. App. 513, 564 N.W.2d 532 (1997).......................................................24

*Platsis v. E.F. Hutton & Co. Inc.*,
   642 F. Supp. 1277 (W.D. Mich. 1986) ............................................... 34, 36, 39, 41

*Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*,
   266 Mich. App. 39, 698 N.W.2d 900 (2005)................................................. 14, 51

*Price v. Annuity Inv'rs Life Ins. Co.*,
   244 F. App'x 654 (6th Cir. 2007)................................................................. 28, 29

*Pueblo v. Crystal Lake Imp. Ass'n*,
   No. 263231, 2007 WL 466068 (Mich. Ct. App. Feb. 13, 2007) ........................22

*Reilly v. Vadlamudi*,
   680 F.3d 617 (6th Cir. 2012) ...................................................................12

*Republic Bank & Trust Co. v. Bear Stearns & Co.*,
   683 F.3d 239 (6th Cir. 2012) ...................................................................41

*Rissman v. Rissman*,
   213 F.3d 381 (7th Cir. 2000) ...................................................................47

*San Diego Cty. Employees Ret. Ass'n v. Maounis*,
   749 F. Supp. 2d 104 (S.D.N.Y. 2010) ...................................................................47

*Schaendorf v. Consumers Energy Co.*,
   275 Mich. App. 507, 739 N.W.2d 402 (2007).......................................................22

*State Farm Fire & Cas. Co. v. Allied & Associates*,
   860 F. Supp. 2d 432 (E.D. Mich. 2012) ............................................................11

*Stephens v. Dixon*,
   449 Mich. 531, 536 N.W.2d 755 (1995)................................................................51

*Stephens v. Worden Ins. Agency, LLC*,
    307 Mich. App. 220, 859 N.W.2d 723 (2014)................................................ 14, 30

*Stryker Corp. v. Ridgeway*,
    No. 1:13-CV-1066, 2015 WL 8759220 (W.D. Mich. Dec. 14, 2015) .................51

*Terlecki v. Stewart*,
    278 Mich. App. 644, 754 N.W.2d 899 (2008).....................................................22

*Trentadue v. Buckler Lawn Sprinkler*,
    479 Mich. 378, 738 N.W.2d 664 (2007)..............................................................23

*Volk v. D.A. Davidson & Co.*,
    816 F.2d 1406 (9th Cir. 1987) ............................................................................26

*Water Works Bd. of City of Birmingham v. Ambac Fin. Grp., Inc.*,
    534 F. App'x 817 (11th Cir. 2013)......................................................................19

*Whitesell Corp. v. Whirlpool Corp.*, No. 1:05-CV-6,
    79, 2009 WL 3327247 (W.D. Mich. Oct. 13, 2009) ...........................................47

*Wilson v. Cont'l Dev. Co.*,
    112 F. Supp. 2d 648 (W.D. Mich. 1999) .............................................................19

*World Surveillance Grp. Inc. v. La Jolla Cove Inv'rs, Inc.*,
    66 F. Supp. 3d 1233 (N.D. Cal. 2014)................................................................19

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,
    413 F.3d 553 (6th Cir. 2005) ................................................................................4

## **<u>Statutes</u>**

M.C.L. § 600.5805 ....................................................................................................14

M.C.L. § 600.5807 ....................................................................................................15

M.C.L. § 600.5813 ....................................................................................................14

M.C.L. § 600.5827 ........................................................................................ 15, 23, 25

M.C.L. § 600.5855 ....................................................................................................24

M.C.L. § 600.5861 ....................................................................................................13

N.J. Stat. Ann. § 49:3-52................................................................... 20, 50

N.J. Stat. § 49:3-71....................................................................... 15, 50

Section 1031 of the Internal Revenue Code ........................................5, 6

## **Rules**

Fed. R. Civ. P. 12(b)(6)................................................................ 3, 4, 11

Fed. R. Civ. P. 9(b) ...........................................................................17

## **Regulations**

17 C.F.R. § 240.17a-3(a)(6)(ii) ...........................................................7

17 C.F.R. § 240.17a-4(b)(1)................................................................7

Definition of the Term "Fiduciary"; Conflict of Interest Rule-Retirement
    Investment Advice,
    81 FR 20946-01 .........................................................................53

## **Other Authorities**

*Mortgage Foreclosure Proceedings: Where We Have Been and Where We Need to Go*,
    48 Akron L. Rev. 129 (2015)...............................................................36

## I.        INTRODUCTION

This dispute arises out of four private placement real estate securities purchased by Plaintiff in the first quarter of 2005. The investments were made through Ann Arbor, Michigan based securities broker-dealer and defendant, Sigma Financial Corporation ("Sigma"), and its then registered representative, Christian Mirner ("Mirner")[1]. Given the subsequent collapse of the economy which decimated the real estate market, the investments did not perform to Plaintiff's expectations.

Now - more than ten years downstream - Plaintiff seeks to hold Sigma and its president, Jerome S. Rydell ("Rydell") (collectively "Defendants"), liable for her investment losses. Plaintiff alleges that Sigma failed to perform due diligence before offering the properties to investors and that Mirner recommended unsuitable investments and made material misrepresentations and omissions regarding the investments. Plaintiff further alleges that the investment sponsors made material misrepresentations in the offering materials and that Sigma is liable as a purported aider and abettor of the sponsor's fraud. Plaintiff does not allege that Rydell was

---

[1] As a licensed securities broker-dealer, Sigma is a member of the Financial Industry Regulatory Authority ("FINRA"). The term registered representative refers to an individual qualified to engage in the securities business and who is registered with a FINRA member-firm. Mirner was a registered representative of Sigma from November 2001 to April 2008 (Compl. at ¶4).

involved in any of the events in dispute, but rather claims he is personally liable as a "control person" under the New Jersey Uniform Securities Law.

Notably, while the investments at issue were made *through* Sigma, they were not purchased *from* Sigma and Sigma did not have any responsibility for the investments subsequent to their purchase. Instead, the investments were purchased from the issuers of the securities (often referred to as "sponsors") who have no affiliation with Sigma. Sigma's only role was to broker the transactions at issue for a one-time sales commission.[2] Once the deals were consummated, its responsibilities were complete. All subsequent responsibilities associated with the investments were handled by the sponsors and/or the property managers, as is abundantly clear from the private placement memoranda ("PPMs") and the various contracts Plaintiff executed in connection with the investments. Notably, neither Sigma, nor any of its registered representatives, is a party to any of these agreements, had any control or responsibility for the properties following their sale or received any compensation for services performed after the sale.

In a transparent attempt to overcome the obvious hurdle posed by the statutes of limitation, Plaintiff attempts to invoke equitable estoppel by claiming

---

[2] Indeed, pursuant to securities laws, investments of this nature must be purchased through a securities broker-dealer. Since the investment sponsors are not themselves securities broker-dealers, they utilize one or more broker-dealers for this purpose. Each of the investments at issue here was sold through multiple broker-dealers.

that Joral Schmalle ("Schmalle"), another registered representative of Sigma who was never Plaintiff's advisor and had no involvement in Plaintiff's transactions, dissuaded Plaintiff from filing a claim sooner. However, even assuming this allegation were true, the Complaint admits on its face that the comments made by Schmalle related to potential claims against a third-party investment sponsor, not against Sigma or any of Sigma's employees or agents. Moreover, as is evident from the specific e-mail referenced in the Complaint (but conveniently omitted as an exhibit): (1) Schmalle was himself an investor in the property that is the subject of the e-mail; (2) Schmalle was corresponding with others as a fellow investor and not as a registered representative of Sigma or advisor to Plaintiff, and (3) Schmalle was merely agreeing with the opinion of another investor (not Plaintiff) that commencing litigation against the sponsor did not make financial sense under the circumstances. Exhibit "1".

Plaintiff further attempts to toll the limitations period by alleging delayed discovery of her claims and/or that the purported misconduct constitutes a continuing wrong. As discussed in more detail below, however, Michigan has abolished both the common law discovery rule and the continuing wrongs doctrine. Accordingly, Plaintiff's efforts to pursue these undeniably stale claims should be rejected and the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.   STATEMENT OF FACTS

This Statement of Facts is based on facts as alleged in the Complaint as well as those established by documents referenced in the Complaint, other documents in the record, and public records.[3]

Sigma is a Michigan corporation and a securities broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). Compl. at ¶2. At the time of the transactions at issue, Mirner was a securities registered representative of Sigma. Compl. at ¶4. Mirner has not been registered with Sigma for more than eight years. Compl. at ¶4.

According to a Declaration submitted by Plaintiff in opposition to Defendants' Motion to Transfer Venue (S.D.N.Y. Docket #42), Plaintiff opened an

---

[3] "When a court is presented with a 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *See also McGillen v. Amex Assurance Co.*, No. 08-12863-BC, 2008 WL 5235919, at *3 (E.D. Mich. Dec. 15, 2008) ("[I]f a plaintiff does not attach to the complaint a written instrument upon which the action is premised, the defendant may introduce the pertinent exhibit without converting a motion to dismiss to one for summary judgment."); *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) ("In addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.").

4

account with Sigma on or about January 25, 2005. Exhibit "2"[4]. At the time, Plaintiff represented that she was a 38-year-old married marketing executive with Sony BMG Music. Exhibit "3". Plaintiff further noted that she had 15 years of investment experience and investable assets in excess of $1,000,000. Exhibit "3". Plaintiff also acknowledged that, like Mirner, her husband was a securities registered representative of a securities broker-dealer.[5] Exhibit "3".

At or around the same time, Mirner assisted Plaintiff in purchasing four real estate securities that qualified for tax deferral under Section 1031 of the Internal Revenue Code (26 U.S.C.A. § 1031). Compl. at ¶¶10,12,18. Plaintiff purchased the investments with the proceeds from the sale of prior investment real estate, including a property located at 2372 Broadway, New York, New York. Exhibit "2". According to the New York City Department of Finance Office of the City Registrar, this property was a residential co-op unit which Plaintiff sold for $1,687,500. Exhibit "4".

The purpose of rolling the proceeds from one investment property to another is to defer the payment of taxes on the capital gain. Compl. at ¶¶17-20. Pursuant to

---

[4] The form itself reflects that the application was signed by Plaintiff on January 17, 2005 and by Mirner on January 25, 2005. Exhibit "3". This document is part of the record (S.D.N.Y. Docket #40) and was cited by the Court in deciding Defendants' Motion to Transfer Venue. See Memorandum and Order dated June 7, 2007 (S.D.N.Y. Docket #47).

[5] He is currently the president and CEO of a real estate development firm. See http://www.rjfinlayco.com/about-us/executive-team (last accessed Sept. 21, 2016).

Section 1031 of the Internal Revenue Code ("Section 1031"), the proceeds must be used to purchase "like-kind" investments (i.e., real estate for real estate). Compl. at ¶18. *See also* 26 U.S.C.A. § 1031. Plaintiff could not defer paying taxes by using her real estate proceeds to purchase more traditional investments such as stocks, bonds or mutual funds. *Id*. Section 1031, then ensures, encourages and supports continued investment in real estate.

Under securities laws, the investments at issue are considered private placement securities which are sold pursuant to private placement memoranda ("PPMs") (sometimes referred to as "offering materials"). Compl. at ¶¶10,12,16,28,35. After reviewing the PPMs for several available properties, Plaintiff elected to diversify her real estate proceeds across the following four investments[6]:

| Date | Amount | Investment | Issuer or Sponsor | Property Type | Location |
|------|--------|------------|-------------------|---------------|----------|
| January 2005 | $305,688 | Cabot Drive | Direct Invest | Industrial Warehouse | Baltimore, MD |
| January 2005 | $620,000 | Ashwood-Southfield | Griffin Capital | Office Buildings | Atlanta, GA and Southfield, MI |
| February 2005 | $195,200 | Signature Ridge | CBRE Investors and US Advisor | Apartments | San Antonio, TX |

---

[6] The details of the investments (name, date, amount, etc.) are generally as alleged in the Complaint. In some circumstances, such as where the information in the Complaint is unclear or incomplete, the information is derived from the PPMs and the subscription documents (copies of which are contained in the PPMs).

6

| March 2005 | $425,000 | Golden Triangle | Direct Invest | Office Building | Greenbelt, MD |

The PPM and Addendum for Cabot Drive are attached as Exhibits "5" and "6". The PPM and Supplement for Ashwood-Southfield are attached as Exhibits "7" and "8". The PPM for Signature Ridge is attached as Exhibits "9". The PPM and Addendum for Golden-Triangle are attached as Exhibits "10" and "11."

These PPMs contain copies of the subscription documents Plaintiff was required to execute in order to consummate the transactions and acquire an interest in the properties, including (among others) Purchaser Questionnaires ("PQ") and Purchase Agreements ("PA"). See Exhibits "5"-"11". Copies of the PQ and PA executed by Plaintiff with respect to her investment in Cabot Drive are attached as Exhibits "12" and "13." Copies of the PQ and PA for Ashwood-Southfield are attached as Exhibits "14" and "15." Copies of the PQ and PA for Plaintiff's investment in Signature Ridge are attached as Exhibits "16" and "17." Sigma has not been able to locate a copy of the PQ and PA executed by Plaintiff regarding Golden Triangle[7], however Plaintiff admits to receiving the PPM containing the subscription documents and to making the investment (Compl. at ¶40,44) which could not have occurred without her execution of the documents. Exhibits "10" and "11."

_____

[7] The record retention requirement for subscription documents for direct private placements is three years. See 17 C.F.R. § 240.17a-3(a)(6)(ii); 17 C.F.R. § 240.17a-4(b)(1).

In executing the subscription documents, Plaintiff made - and Sigma relied upon - a number of representations with respect to the suitability of the investments, her qualification as an accredited investor, her receipt and understanding of the PPM including all of the risks disclosed therein, and her sole reliance on the written offering documents and nothing else, including oral statements by others. Exhibits "5"-"17". By way of example, Defendants cite to the PPM and Addendum, PQ and PA for Ashwood-Southfield. The form and content of the documents regarding the other three investments are substantially similar.

The Ashwood-Southfield PQ executed by Plaintiff reflects her understanding and agreement that (among other things):

- the investment was being offered "in accordance with the terms and conditions described" in the PPM and Supplement;

- the investment was available only to accredited investors and that Plaintiff was an accredited investor;

- Plaintiff, together with her spouse, had a net worth in excess of $1,000,000 and an annual income in excess of $300,000;

- Plaintiff's $620,000 investment represented no more than 25% of her net worth;

- The investment was not registered under state or federal securities laws and was being sold pursuant to a registration exemption; and

- Plaintiff had "such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks" of the investment.

8

Exhibit "13."

In executing the Ashwood-Southfield PA, Plaintiff made the following additional representations and warranties:

- Plaintiff is relying solely on her own inspection, investigation and analysis of the property in making her decision to invest;

- Plaintiff is not relying "in any way on any representations, statements, agreements, warranties, studies, reports, descriptions, guidelines or other information . . . whether oral or written" of others;

- Plaintiff is a "sophisticated, experienced investor" who will rely solely upon her own review of the property;

- Plaintiff understands that "the seller only recently acquired the property and has limited knowledge regarding the condition of the property";

- Plaintiff "received, read and fully understands the Memorandum, the Supplement and all attachments and exhibits thereto";

- Plaintiff "acknowledges that [she] is basing [her] decision to invest on the Memorandum, the Supplement, and any exhibits or attachments thereto";

- Plaintiff "further acknowledges that [she] has relied only on the information contained in such materials and has not relied upon representations made by any other person";

- Plaintiff "recognizes that an investment involves substantial risk and [she] is fully cognizant of and understands all of the risk factors";

- Plaintiff's commitment to illiquid investments is not disproportionate to her net worth; and

- All of the information that Plaintiff provided regarding her "suitability to invest" is "complete, accurate and correct."

Exhibit "14."

The Ashwood-Southfield PPM which Plaintiff acknowledged receiving, reading and understanding (Exhibit "6") includes detailed information regarding the following subjects: Program Summary; Risk Factors; Estimated Use of Funds; Compensation and Fees; Investment Objective and Policies; Absence of Fiduciary Duty; Conflicts of Interest; About the Sponsor; Summary of the Purchase Agreement; Summary of the Tenants in Common Agreement; Summary of the Asset Management Agreement; Summary of the Call Agreement; Multiple Parcel Transactions; Federal Income Tax Consequences; Plan of Distribution; Restrictions on Transfer of Interests; Who May Invest; Legal Opinions; Other Documents; and Supplemental Sales Literature.

The Ashwood-Southfield Addendum (Exhibit "7"), which again Plaintiff agrees she received and read, includes the following supplemental information: Summary of the Offering; Additional Risk Factors; Estimated Use of Funds; Compensation and Fees; The Atlanta Property; The Southfield Property; Property Rent Roll and Tenant Profiles; Multiple Parcel Transactions; Acquisition Terms and Financing; Insurance; Who May Invest; Method of Purchase; Other

Documents; Superceding (sic) Information; Cash Flow Projections and Assumptions; and Copies of: Purchaser Questionnaire, Purchase Agreement and Escrow Instructions, Tenants In Common Agreement, Asset Management Agreement, Call Agreement, Legal Opinion.

According to the Complaint, the investments did not perform to Plaintiff's expectations. Specifically, Plaintiff alleges that "the properties at issue ceased paying distributions and all but one were foreclosed upon." Compl. at ¶12. Plaintiff seeks to shift the blame for the alleged poor performance of the investments on Sigma by accusing Sigma and its registered representatives of various misdeeds. As discussed in more detail below, these allegations fail to state a claim for which relief can be granted and should be dismissed.

## III.   ARGUMENT

### A.   Standard of Decision

A complaint which fails to state a claim for which relief can be granted is subject to dismissal. Fed. R. Civ. P. 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *State Farm Fire & Cas. Co. v. Allied & Associates*, 860 F. Supp. 2d 432, 440 (E.D. Mich. 2012) (citations omitted). While the Plaintiff is entitled to all reasonable inferences from the facts as plead, the Court can disregard legal conclusions or

unwarranted factual inferences. *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 617 (6th Cir. 2008). Indeed, the presumption in Plaintiff's favor is overcome when the allegations are contradicted by documents referenced in or attached to the Complaint. *Kayser v. Green Tree Servicing, LLC*, No. 12-CV-14901, 2013 WL 4613534, at *3 (E.D. Mich. Aug. 29, 2013). Moreover, the complaint must include more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (citations and quotation marks omitted).

In deciding a motion to dismiss, the Court is generally limited to considering the complaint itself, with some exceptions. *Mapal, supra*. Documents attached to or referenced in the complaint are considered part of the pleading. *Id*. Moreover, the Court can also consider items appearing in the record, public documents, written instruments integral to the claims, and documents or facts subject to judicial notice. *See Solo*; *Kreipke*; *Mapal Inc.*; and *McGillen, supra*.

## B.   Plaintiff's Claims Are Barred by the Statutes of Limitation.

### 1.   The Nature and Purpose of Statutes of Limitation

"In the ordinary course, a statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.' Black's Law Dictionary 1546 (9th ed. 2009) (Black's)." *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182, 189 L. Ed. 2d 62, *reh'g denied,* 135 S. Ct. 23, 189 L. Ed. 2d 874 (2014). "As a

general matter, statutes of limitations establish the period of time within which a claimant must bring an action. They characteristically embody a policy of repose, designed to protect defendants. And they foster the elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1234, 188 L. Ed. 2d 200 (2014) (internal citations and quotation marks omitted). "Statutes of limitations promote justice by preventing surprises through plaintiffs' revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *CTS Corp., supra* at 2183 (citation and internal quotation marks omitted).

### 2.     The Applicable Law

"Generally, the procedural law of the forum state applies, including its statutes of limitations." *Elec. Power Bd. of Chattanooga v. Monsanto Co.*, 879 F.2d 1368, 1375 (6th Cir. 1989). "Under Michigan conflicts law, statutes of limitations are deemed to be procedural, rather than substantive, and are to be governed by the law of the forum." *Isley v. Capuchin Province*, 878 F. Supp. 1021, 1025 (E.D. Mich. 1995). To the extent Plaintiff argues that her claims accrued in another state, Michigan's "borrowing statute" operates to prohibit claims barred either by Michigan's limitation period *or* the limitations period of the other state. M.C.L. § 600.5861. "In other words, if the statute of limitations of either state or

jurisdiction bars the plaintiff's claim, the action should be dismissed." *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 243 (6th Cir. 2009).

### 3. Plaintiff's Claims are Governed by Two, Three and Six Year Limitations Periods.

Plaintiff asserts causes of action for breach of fiduciary duty, unjust enrichment, negligence, fraud, aiding and abetting fraud, fraud in the inducement and violation of the New Jersey Uniform Securities Law. Notwithstanding the various labels Plaintiff assigns her claims, they all arise out of three basic allegations: (1) Sigma failed to conduct due diligence on the investments before offering them for sale to Plaintiff, (2) Mirner recommended unsuitable investments to Plaintiff and (3) Mirner made material misrepresentations and omissions which induced Plaintiff to purchase the investments.

Plaintiff's negligence and breach of fiduciary duty claims are governed by Michigan's three-year limitation period applicable to claims for injury to property. M.C.L. § 600.5805(10); *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 47, 698 N.W.2d 900, 908 (2005) (finding three-year limitation on fiduciary claims); *Stephens v. Worden Ins. Agency, LLC*, 307 Mich. App. 220, 234, 859 N.W.2d 723, 732 (2014) (finding three-year limitation on ordinary negligence claims). The claims sounding in fraud (i.e., fraud, aiding and abetting fraud, fraud in the inducement) are governed by Michigan's six-year "catchall" statute of limitation. M.C.L. § 600.5813; *Executone Bus. Sys. Corp. v.*

14

*IPC Commc'ns, Inc.*, 177 Mich. App. 660, 664, 442 N.W.2d 755, 758 (1989). Plaintiff's unjust enrichment claim is governed by the six-year limitations period for claims relating to contracts. M.C.L. § 600.5807; *Huhtala v. Travelers Ins. Co.*, 401 Mich. 118, 124–125, 257 N.W.2d 640 (1977)). Finally, Plaintiff's securities claim arising under New Jersey statute is governed by a two-year limitations period. N.J. Stat. § 49:3-71.

### 4.    Plaintiff's Claims Accrued No Later than the Date of Investment.

The limitations period begins to run at the time a claim accrues. M.C.L. § 600.5827. Under Michigan law, absent express statutory language to the contrary, a "claim accrues *at the time the wrong upon which the claim is based was done regardless of the time when damage results*." M.C.L. § 600.5827 (emphasis added). Thus, Plaintiff's claims accrued when: (1) Sigma offered the investments for sale allegedly without first conducting due diligence; (2) when Mirner recommended the allegedly unsuitable investments to Plaintiff; and (3) when Mirner made the alleged material misrepresentations and omissions which induced Plaintiff to purchase the investments.

Given the nature of these claims, all of the alleged misconduct necessarily transpired prior to or contemporaneous with Plaintiff's investments, which Plaintiff admits occurred in early 2005. See Compl. at ¶10. For example, since due diligence is performed before an investment is offered to investors, any purported

15

due diligence failure occurred prior to Plaintiff's 2005 purchases. Similarly, an unsuitable investment recommendation clearly predates the purchase of the recommended investment. Likewise, any misrepresentation or omission which purportedly induced Plaintiff to purchase the investments necessarily preceded the transactions. Moreover, the basis of Plaintiff's unjust enrichment claim is that it is inequitable for Defendants to retain commission payments received as a result of the foregoing fraudulent conduct. See, e.g., Compl. at §102. Thus, this claim is likewise based on acts allegedly committed prior to Plaintiff's purchase of the investments in 2005. Accordingly, the limitations period for Plaintiff's claims expired in 2008 and 2011. Her Complaint filed in March 2015 is untimely by several years.

### 5.    There Are No Grounds for Tolling or Extending the Limitations Periods.

The Complaint makes several vague claims clearly designed to avoid the effects of the limitations periods. For example, Plaintiff alleges that:

- The misrepresentations and omissions were "continuous" (Compl. at ¶10);

- She "only recently discovered" her claims (Compl. at ¶10);

- Defendants concealed their wrongful conduct (Compl. at ¶95); and

- Her claims did not accrue until she suffered a "loss event" (Compl. at ¶37).

None of these assertions saves Plaintiff's decade-old claims. First, the allegation of "continuous" misrepresentations and omissions is generic and

16

conclusory. While Plaintiff provides specific detail about alleged misrepresentations and omissions made "in connection with the offer" of the investments (i.e., at the time of their purchase in 2005) (see Compl. at ¶38), she states nothing about any alleged misrepresentations or omissions occurring at any time afterward.[8] Plaintiff fails to identify any specific post-investment misrepresentation or omission, state who made it, or say when or where it occurred. Accordingly, Plaintiff fails to meet the heightened pleading requirements under Fed. R. Civ. P. 9(b) as to the purported "continuous" misrepresentations or omissions.[9] *See Berry v. Main St. Bank*, 977 F. Supp. 2d 766, 775 (E.D. Mich. 2013) ("To satisfy Rule 9(b)'s particularity requirement, a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'") (citations omitted).

---

[8] While Plaintiff provides *some* detail as to an alleged post-investment statement by Schmalle in April 2009, this statement was allegedly made for the purpose of dissuading Plaintiff from pursuing claims (Compl. at §§86-87), not misrepresenting the nature of the investments. Accordingly, while it may relate to an equitable estoppel argument (discussed *infra*), this statement does not form the basis of any fraud claim.

[9] "Although this is a diversity case, and the substance of fraud claims must be decided under state law, the manner in which the fraud is alleged is still governed by Rule 9." *McIntyre's Mini Computer Sales Grp., Inc. v. Creative Synergy Corp.*, 644 F. Supp. 580, 587 (E.D. Mich. 1986).

Further, Plaintiff's unspecified claims of continuous misrepresentations or omissions fail for another obvious reason (and one which would render any amendment futile), which is that the crux of Plaintiff's Complaint is that she was "induced by Defendants to invest" (Compl. at ¶37) because of "material misrepresentations and/or omissions made by Defendants" (Compl. at ¶38)[10]. Plaintiff cannot have been induced (i.e., relied) on any purported statements made *after the fact* in making her investment decisions. Reliance is a necessary element of a fraud claim and, without it, Plaintiff has no cause of action. *1031 Lapeer LLC*

---

[10] See also ¶130 "In order to induce Plaintiff to invest . . . Defendants made false, affirmative representations and intentional omissions of material facts."

*v. Rice*, 290 Mich. App. 225, 236, 810 N.W.2d 293, 300 (2010).[11] Plaintiff similarly could not have relied on post-investment representations because the investments at issue are illiquid[12] (Compl. at ¶¶21,27), precluding Plaintiff from changing her position in reliance. Instead, and as is clear from the PPMs, Plaintiff was contractually required to hold each of the investments for its entire lifecycle. See, e.g., Exhibit "8" ("Assumed Holding Period 7 [years]."); Exhibit "15" at p.6 ("Buyer's investment in Buyer's Interest will be highly illiquid and may have to be

---

[11] *See also See also Wilson v. Cont'l Dev. Co.*, 112 F. Supp. 2d 648, 661 (W.D. Mich. 1999), *aff'd,* 234 F.3d 1271 (6th Cir. 2000) ("Plaintiff cannot possibly prove that he was induced to part with his interest . . . by misrepresentations made by defendants one year later."); *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543 (D.N.J. 1992), *aff'd sub nom. In re Donald J. Trump Casino Sec. Litig.- Taj Mahal Litig.*, 7 F.3d 357 (3d Cir. 1993) ("Plaintiffs cannot rely on statements made subsequent to their purchases . . . because plaintiffs could not have relied on the statements in making their purchases in the first place."); *World Surveillance Grp. Inc. v. La Jolla Cove Inv'rs, Inc.*, 66 F. Supp. 3d 1233, 1237 (N.D. Cal. 2014) ("[T]he ink was already dry on the deal documents by the time [the statements] were allegedly made, and consequently WSGI could not have relied upon them as a basis for entering into the contracts."); *Water Works Bd. of City of Birmingham v. Ambac Fin. Grp., Inc.*, 534 F. App'x 817, 820 (11th Cir. 2013) ("[S]tatements highlighted by the Board cannot be the basis for the Board's misrepresentation claim because they were made after the Board bought the surety bond so the Board could not have relied on them."); *High Tides, LLC v. DeMichele*, 88 A.D.3d 954, 958, 931 N.Y.S.2d 377, 381 (2011) ("These alleged misrepresentations and omissions may not form the basis for the plaintiff's fraud claims to the extent that they were made after any such investment, since the element of reliance is necessarily absent.").

[12] An illiquid investment is one which "is not readily convertible into cash, usu. because of (1) the lack of demand, (2) the absence of an established market, or (3) the substantial cost or time required for liquidation (such as for real property, even when it is desirable)." ASSET, Black's Law Dictionary (10th ed. 2014).

19

held indefinitely"); Exhibit "14" at p.14 ("The undersigned understands that the Interests . . . are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under [securities statutes].").[13]

Plaintiff's claims of "continuous" misrepresentations fail for yet another reason – Michigan has abolished the common law "continuing wrongs" doctrine previously relied on by plaintiffs to save or revive stale claims. This issue was analyzed in detail by the Michigan Supreme Court in *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 472 Mich. 263, 696 N.W.2d 646 (2005), *opinion amended on denial of reh'g* (July 18, 2005), which found the practice inconsistent with legislative intent regarding the timeliness of claims:

> Whatever the merits of the policy crafted by *Sumner,* it bears little relationship to the actual language of the relevant statute of limitations, M.C.L. § 600.5805, and M.C.L. § 600.5827. Fundamental canons of statutory interpretation require us to discern and give effect to the Legislature's intent as expressed by the language of its statutes. *DiBenedetto v. West Shore Hosp.,* 461 Mich. 394, 402, 605 N.W.2d 300 (2000). If such language is unambiguous, as most such language is, *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447 (2003), "we presume that the Legislature intended the meaning clearly expressed - no further judicial construction is required or permitted, and the statute must

---

[13] To the extent Plaintiff's claim for violation of the New Jersey Uniform Securities Law is based on purported misrepresentations or omissions made after the fact, it fails as a matter of law where the anti-fraud provisions unambiguously apply solely to misrepresentations or omissions "made in connection with the offer, sale, or purchase" of a security (i.e., contemporaneous). N.J. Stat. Ann. § 49:3-52.

be enforced as written." *DiBenedetto, supra* at 402, 605
N.W.2d 300.

M.C.L. § 600.5805 provides, in pertinent part:

> (1) A person shall not bring or maintain an action
> to recover damages for injuries to persons or
> property unless, after the claim first accrued to the
> plaintiff or to someone through whom the plaintiff
> claims, the action is commenced within the periods
> of time prescribed by this section.
>
> * * *
>
> (10) The period of limitations is 3 years after the
> time of the death or injury for all other actions to
> recover damages for the death of a person, or for
> injury to a person or property.

M.C.L. § 600.5827 provides that a "claim accrues at the
time the wrong upon which the claim is based was done
regardless of the time when damage results." Thus, §
5805 requires a plaintiff to commence an action within
three years of each adverse employment act by a
defendant. Section 5805 does not say that a claim outside
this three-year period can be revived if it is somehow
"sufficiently related" to injuries occurring within the
limitations period. Rather, the statute simply states that a
plaintiff "shall not" bring a claim for injuries outside the
limitations period. Nothing in these provisions permits a
plaintiff to recover for injuries outside the limitations
period when they are susceptible to being characterized
as "continuing violations." To allow recovery for such
claims is simply to extend the limitations period beyond
that which was expressly established by the Legislature.

*Id.* at 281–285 (emphasis in original, footnotes omitted).

While *Garg* dealt specifically with claims arising under an

antidiscrimination statute, its holding has been broadly extended to all claims

21

governed by Michigan's statutes of limitation. *See, e.g., Terlecki v. Stewart*, 278 Mich. App. 644, 655, 754 N.W.2d 899, 907 (2008) ("[T]he holding of *Garg* does not appear limited to discrimination cases; rather, the Court applied the plain text of the limitations and accrual statutes at issue here."); *Massey v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 462 F. Supp. 2d 780, 786 (E.D. Mich. 2006) ("While the *Garg* Court only directly addressed the doctrine as applied to Michigan's Civil Rights Act, the reasoning is equally applicable to all Michigan statutes of limitations which have been extended through case law by application of the continuing violations doctrine . . . The court is thus inclined to find that the continuing violations doctrine is no longer viable under Michigan law and cannot be used to extend the relevant Michigan statutes of limitations.").[14]

Next, Plaintiff's averments of delayed discovery are likewise insufficient to save her claims. First, these assertions are merely vague pronouncements devoid of specific factual allegations, including why Plaintiff was purportedly unable to discover her claims earlier, especially in light of the fact that Plaintiff has had possession of the PPMs since 2005 which disclose all of the information Plaintiff claims was withheld or misrepresented. See, e.g., Compl. at ¶10 ("The investments

---

[14] *See also Pueblo v. Crystal Lake Imp. Ass'n*, No. 263231, 2007 WL 466068 (Mich. Ct. App. Feb. 13, 2007) (extending *Garg* to contract claim); *Moyer v. Comprehensive Rehab. Ctr., Inc.*, No. 292061, 2010 WL 3604680 (Mich. Ct. App. Sept. 16, 2010) (extending *Garg* to Whistleblower claim); *Schaendorf v. Consumers Energy Co.*, 275 Mich. App. 507, 518, 739 N.W.2d 402, 409 (2007) (extending *Garg* to injury to property claim).

22

were solicited in 2005 and involved various misrepresentations and omissions, some of which . . . were only recently discovered.").

Second, all of the information Plaintiff alleges was misrepresented or withheld is contained in the written offering materials Plaintiff admits to receiving. (Discussed in more detail in Section C, below.) Plaintiff cannot claim she failed to discover her claims until sometime conveniently within the limitations period when the information was available at her fingertips more than ten years ago.

Third, Plaintiff's assertion that she "only recently" discovered her claims is contradicted by her allegation that in April 2009, Schmalle "discouraged the Plaintiff . . . from seeking legal counsel to pursue claims related to [her] losses in the properties" (Compl. at ¶86). This is clearly an admission by Plaintiff that she was aware of the existence of a potential claim prior to April 2009.

Last, and fatal to Plaintiff's effort, is the fact that, like the "continuing wrongs" doctrine, Michigan has abolished the common law "discovery rule" as a means to toll the accrual of a claim. A claim accrues when the underlying wrongful act is committed, period. M.C.L. § 600.5827. In *Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 390, 738 N.W.2d 664, 671 (2007), the Michigan Supreme Court held that the so-called discovery rule is inconsistent with legislation dictation that accrual occurs at the time of the underlying wrong and not afterwards:

> Since the Legislature has exercised its power to establish tolling based on discovery under particular circumstances, but has not provided for a general discovery rule that tolls or delays the time of accrual if a plaintiff fails to discover the elements of a cause of action during the limitations period, no such tolling is allowed. Therefore, we conclude that courts may not employ an extrastatutory discovery rule to toll accrual in avoidance of the plain language of MCL 600.5827 and we reject this Court's contrary conclusion in *Chase v. Sabin*, 445 Mich. 190, 191–192, 516 N.W.2d 60 (1994).

*Id.* at 92.

The only statute relevant to the dispute at hand which contains an express tolling provision relates to the fraudulent concealment of claims. M.C.L. § 600.5855. While Plaintiff vaguely asserts that Defendants engaged in fraudulent concealment, she fails to allege any specific acts of concealment. To satisfy the pleading requirements for fraudulent concealment, Plaintiff must allege: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975). Moreover, the acts or misrepresentations that comprise the fraudulent concealment must be specifically pled. *Phinney v. Perlmutter*, 222 Mich. App. 513, 562, 564 N.W.2d 532, 558 (1997).

24

Here, Plaintiff's only allegation of fraudulent concealment states "Due to Defendants efforts to conceal and hide their wrongful conduct, Plaintiff was unable to initially discover their breached (sic)". Compl. at ¶95. This clearly falls short of the pleading requirements as it fails to identify any specific acts of concealment, allege that these acts prevented Plaintiff from discovering her claims, or that Plaintiff exercised due diligence in discovering the facts. Indeed, Plaintiff cannot credibly claim that she exercised due diligence when the information she claims was misrepresented or concealed was disclosed in the written offering materials Plaintiff admits receiving. Regardless, the tolling provision requires that a plaintiff bring any claim within two years from discovery. Here, Plaintiff admits to having discovered her claims prior to April 2009. Compl. at ¶86. Therefore, even if her claim of fraudulent concealment was sufficiently pled, the two-year period expired in no later than April 2011, nearly five years before the Complaint was filed.

Plaintiff's efforts to toll the running of the limitations period until she incurred damages is further unavailing given the express language of Michigan's accrual statute, which makes clear that the limitations period begins to run from the date of the underlying wrongful act "*regardless of the time when damage results*." M.C.L. § 600.5827 (emphasis added). Thus, the date Plaintiff claims she incurred a loss on the investments is irrelevant. Moreover, as ample case law makes clear, in the context of an investment fraud claim, a plaintiff is injured the moment she parts

with her money and buys an investment that is other than as it was represented. *See, e.g., Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987) ("In a securities fraud case, the cognizable injury occurs at the time an investor enters . . . a transaction as a result of material misrepresentations. This constitutes the injury giving rise to a cause of action, even if an actual monetary loss is not sustained until later.").[15]

### 6.   Plaintiff Cannot Invoke Equitable Estoppel to Bar the Statute of Limitations Defense.

In a further attempt to avoid the effect of the statutes of limitation, Plaintiff claims that Schmalle "counseled her not to sue" with the implication that

---

[15] *See also Carlucci v. Han*, 886 F. Supp. 2d 497, 511 (E.D. Va. 2012) ("[I]f the notes were worth less than represented at the time Carlucci purchased them, then he has suffered a cognizable injury which can support his claims."); *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F. Supp. 2d 444, 458 (S.D.N.Y. 2001) ("Defendants' fraud induced Plaintiffs to enter into the Purchase Agreement on terms . . . which they would not have accepted if they had known the undisclosed facts. Hence, the 'injury' from this fraud occurred when Plaintiffs entered into the Purchase Agreement."); *Pecon SA v. Chicago Research & Trading Grp., Ltd.*, No. 92 C 7013, 1993 WL 390213, at *1 (N.D. Ill. Oct. 1, 1993) ("Clearly, plaintiff was injured when it paid more money for the shares than they were worth."); *Butala v. Agashiwala*, 916 F. Supp. 314, 317 (S.D.N.Y. 1996) ("The plaintiffs allege that these investments were fraudulent from their inception. Consequently, the plaintiffs were injured when they purchased them."); *In re Merrill Lynch Ltd. Partnerships Litig.*, 7 F. Supp. 2d 256, 264 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 56 (2d Cir. 1998) ("Plaintiffs allege that the limited partnerships were fraudulent because even at the outset, the limited partnerships could never achieve their promised objectives. Accepting that allegation as true, plaintiffs sustained recoverable out-of-pocket losses when they invested.").

Defendants should be estopped from asserting the statute of limitations as a defense. This attempt to save Plaintiff's stale claims fairs no better than the others.

"[E]quitable estoppel applies when plaintiffs are aware of their claims but defendants' conduct prevents plaintiffs from timely filing suit." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 424 (6th Cir. 2009). "Equitable estoppel requires affirmative steps or action on the part of a defendant. Plaintiffs must have reasonably relied on defendants' affirmative conduct in failing to file suit within the statute of limitations. Also, like equitable tolling, plaintiffs invoking equitable estoppel must establish due diligence." *Id.* "For equitable estoppel to apply, plaintiff must establish that (1) defendant's acts or representations induced plaintiff to believe that the limitations period clause would not be enforced, (2) plaintiff justifiably relied on this belief, and (3) she was prejudiced as a result of her reliance on her belief that the clause would not be enforced." *Fuller v. GEICO Indem. Co.*, 309 Mich. App. 495, 504, 872 N.W.2d 504, 510 (2015) (citation omitted").

"Courts are to apply equitable estoppel sparingly and only in the most extreme cases, for example, when a defendant intentionally or negligently deceives a plaintiff." *Id.* Equitable estoppel is inappropriate absent conduct "clearly designed to induce [plaintiff] to refrain from bringing action within the period

fixed by statute." *Price v. Annuity Inv'rs Life Ins. Co.*, 244 F. App'x 654, 659–60 (6th Cir. 2007).

Here, a review of Plaintiff's allegation in this regard reveals that she fails to satisfy any, let alone all, of the criteria to invoke equitable estoppel. Plaintiff claims that in April 2009, Schmalle "discouraged her . . . from seeking legal counsel to pursue claims related to [her] losses in the properties" by stating in an e-mail (which was not directed specifically to Plaintiff but merely ) that "suing does not make sense & we should focus on improving the terms of the agreement." Compl. at ¶86. Plaintiff further states that Schmalle told her that the "sponsor's (sic) did not do anything wrong and that pursuing claims against the sponsors would not be successful." Compl. at ¶87. Not surprisingly, despite referencing and even quoting from the e-mail, Plaintiff fails to attach a copy to her Complaint. It is included here as Exhibit "1". As discussed above, since Plaintiff refers to the document in her Complaint, it is deemed part of the pleadings and can be considered in ruling on a motion to dismiss.

As an initial matter, it was Mirner, not Schmalle who was the registered representative assigned to Plaintiff at the time she purchased the investments. If any misrepresentations or omissions were made in connection with those purchases, they were made by Mirner, not Schmalle. Moreover, as is evident from the e-mail: (1) Schmalle is merely responding to an e-mail from another investor

(not Plaintiff) in the Signature Ridge property on which Plaintiff and many other investors are copied[16]; (2) Schmalle is speaking as a fellow investor in the property, not as an agent of Sigma; (3) Schmalle makes no statements of material fact designed to deceive and instead expresses merely an opinion; (4) Schmalle's comment relates to potential claims against the investment sponsor, CBREI, not Sigma or any of its agents; (5) nowhere in the e-mail does Schmalle instruct or even suggest that Plaintiff should not retain counsel or sue Sigma, nor does he make any reference to the statute of limitations. Exhibit "1".

Nothing about this scenario represents the sort of "extreme case" which would justify the Court's sparing use of equitable estoppel to deprive a defendant of its right to an affirmative defense. *Egerer, supra*. Schmalle's comments were not fraudulent or deceitful and they were not "clearly designed to induce" Plaintiff not to sue Sigma. *Price, supra*. Moreover, Plaintiff fails to plead any diligence on her part to pursue her claims – claims which she admits she knew existed by April 2009.[17] *Egerer, supra*. It is simply not reasonable under any objective standard for Plaintiff to have relied on this e-mail (which relates solely to one of Plaintiff's four

---

[16] This email has nothing to do with Plaintiff's three other investments. Accordingly, even if Plaintiff pled sufficient facts to invoke equitable estoppel (which she clearly has not), she cannot rely on same to avoid the statute of limitations as it relates to Ashwood-Southfield, Cabot Drive or Golden Triangle.

[17] And which Plaintiff knew or should have known existed upon receipt of the offering materials in 2005.

investments) to forego suit for *six more years* - years during which the properties allegedly stopped paying distributions and fell into foreclosure. Compl. at ¶37.

### C.     Plaintiff Cannot Establish Reliance As a Matter of Law.

"Fraud claims must be pleaded with particularity, addressing each element of the tort." *Stephens v. Worden Ins. Agency, LLC*, 307 Mich. App. 220, 229-30, 859 N.W.2d 723, 729-30 (2014). "To properly plead a fraud claim, the plaintiff must allege that (1) the defendant made a representation that was material, (2) the representation was false, (3) the defendant knew the representation was false, or the defendant's representation was made recklessly without any knowledge of the potential truth, (4) the defendant made the representation with the intention that the plaintiff would act on it, (5) the plaintiff actually acted in reliance, and (6) the plaintiff suffered an injury as a result." *Id.* The omission of a material fact can also

form the basis of a fraud claim where one is under a duty to disclose.[18] *1031 Lapeer LLC v. Rice*, 290 Mich. App. 225, 237, 810 N.W.2d 293, 300 (2010). There can be no fraud, however, where one has the means to determine the truth. *Id.*

In fraud cases involving investments, an investor clearly has the "means to determine the truth" if the information allegedly misrepresented or omitted is contained in the written offering materials provided to the investor. In other words, where the alleged misrepresentations/omissions are contradicted by the offering materials, the element of reliance cannot be established as a matter of law. This issue was analyzed in detail in *Harner v. Prudential Sec. Inc.*, 785 F. Supp. 626 (E.D. Mich. 1992), *aff'd sub nom. Harner v. Prudential-Bache Sec., Inc.*, 35 F.3d 565 (6th Cir. 1994) where plaintiffs asserted various fraud claims based on alleged material misrepresentations and omissions regarding an aircraft leasing limited partnership investment.

---

[18] Here, Sigma clearly had no duty to disclose any information to Plaintiff that was in addition to or different from what was contained in the PPMs and, indeed, the PPMs informed Plaintiff of the prohibition against third parties providing outside information and her reliance on same. See, e.g., Exhibit "7" at p.i ("We have not authorized any person to make any representations or furnish any information with respect to the Program, Interests or any Property, other than as set forth in this Memorandum, Supplements hereto or other documents or information we may furnish to you upon request, as described herein . . . In addition, you must disregard any projections and representations, written or oral, which do not conform to those contained in this Memorandum and the Supplements."); Exhibit "7" at p.55 ("You must represent in writing that you meet, among others, all of the following requirements: . . .You have relied only on the information contained in this Memorandum and the Supplement and have not relied on any representations made by any other person.").

31

The Court compared the alleged acts of fraud with the disclosures in the written offering materials and ultimately concluded that the investors could not establish reliance given the content of these documents:

> The Complaint alleges, essentially, that the Defendants, knowing that the aircraft market was very bad, marketed limited partnership units to the Plaintiffs with promises of favorable returns.
>
> * * *
>
> As noted in the above section on the limitations period, however, the Prospectus contains numerous cautionary notices, not only as to the depressed state of the market but also as to the general risk of the investment. For example, the Prospectus notes that
>
>> [v]arious factors have depressed the current level of demand for business and commercial aircraft. ... There can be no assurance that these or other factors will not continue to depress the demand for aircraft in the future.
>
> Also, the first page of the Prospectus states that
>
>> THE SECURITIES OFFERED HEREBY ARE SPECULATIVE SECURITIES AND INVOLVE A HIGH DEGREE OF RISK. THE RISKS ASSOCIATED WITH THIS OFFERING ARE REFERRED TO ON THE FOLLOWING PAGE AND ARE DESCRIBED IN THIS PROSPECTUS IN THE SECTION ENTITLED "RISK FACTORS."
>
> These warnings would alert any reasonable investor to the possibility of loss in the investment and the need to use caution when committing finances to the Partnerships.

32

* * *

In their briefs and at oral argument, the Plaintiffs complained that the Defendants did not adequately set forth the risks and problems besetting the aircraft leasing market at that time of their investment. However, the law does not require that offering materials denigrate the value of the investment or otherwise emphasize the poor condition of the market.

* * *

Similarly, the Defendants were not required to condescend to the Plaintiffs. The law assumes a certain level of comprehension and judgment among investors. *See Consol. Goldfields, PLC v. Anglo Am. Corp.*, 713 F.Supp. 1457, 1470 (S.D.N.Y.1989) ("corporations are not required to address their stockholders as if they were children"); *Richland v. Crandall*, 262 F.Supp. 538, 554 (S.D.N.Y.1967) (same). This is especially true in the instant case as the potential investors were required to attest to their net worth and ability to accept risks, thereby implicitly acknowledging their ability to read critically the Prospectus and other sales materials.

* * *

To the extent that they relied on prognoses, written or oral, that the market was good and that they were assured a steady stream of income, this reliance was unreasonable in the context of the mix of information available to them.

33

*Id.* at 640–642.[19]

The instant Complaint asserts several fraud-based claims based on allegations that Defendants made various misrepresentations and omissions which purportedly induced Plaintiff to make the investments at issue. See, e.g., Compl. at ¶130 ("In order to induce Plaintiff to invest in the TICs, Defendants made false, affirmative representations and intentional omissions of material facts regarding the nature of the investment in connection with the solicitation of Plaintiff and Plaintiff's investment"). Notwithstanding this claim, the PPMs - which Plaintiff admits to receiving in advance of making the investments (Compl. at ¶44) - contradict each of Plaintiff's claimed omissions and misrepresentations. Again,

---

[19] *See also Platsis v. E.F. Hutton & Co. Inc.*, 642 F. Supp. 1277, 1299 (W.D. Mich. 1986), *aff'd,* 829 F.2d 13 (6th Cir. 1987) ("Where an investor is presented with oral representations in the offer or sale of an investment which conflict with written representations made in the Offering Memorandum, or where he is expressly warned in the Offering Memorandum that any oral representations which are inconsistent with the written representations contained therein are unauthorized and are not to be relied upon, it is not reasonable for an investor to rely upon such oral representation and as a matter of law the element of justifiable reliance is not satisfied."); *Abbo v. Wireless Toyz Franchise, L.L.C.*, No. 304185, 2014 WL 2515174, at *3 (Mich. Ct. App. May 13, 2014) ("In light of these significant warnings and disclaimers, it cannot be concluded that plaintiffs reasonably relied on any statements made before the parties entered into the written franchise agreement."); *Cent. States Joint Bd. v. Cont'l Assur. Co.*, 117 Ill. App. 3d 600, 606, 453 N.E.2d 932, 936 (1983) ("A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another."); *Oliverio v. Nextel W. Corp.*, No. 13-10296, 2013 WL 2338706, at *1 (E.D. Mich. May 29, 2013) ("Plaintiffs' proposed promissory estoppel and fraud claims fail as a matter of law because Plaintiffs cannot establish reasonable reliance on any alleged verbal statements that contradict the express terms of the written contract that they signed and agreed to.").

Defendants cite to the Ashwood-Southfield PPM by way of example, except as otherwise noted:[20]

| **Alleged Misrepresentation/Omission:** Defendants promised Plaintiff that "the properties in question would yield a consistent rate of return" (Compl. at ¶38). |
|---|
| **Response:** The PPMs are replete with warnings that there are no guarantees with respect to the investments: "No Certainty of Payments. There can be no assurance that the Property will produce sufficient cash flow to allow for anticipated payments to the Tenants in Common. Such payments, if any, will be subject to the payment of expenses and the maintenance of reserves and may be restricted or suspended when the Asset Manager determines in its sole discretion that to do so would be in the best interest of the Property" (Ex. "7", p.15).<br><br>"Therefore, the actual results achieved during the period covered is likely to vary from the Cash Flow Projection, and the variation may be material. As a result, your rate of return may be higher or lower than that set forth. Your return on your investment in the Interests will depend upon economic factors and conditions beyond our control" (Ex. "8", p.89).<br><br>"We believe that the Property was acquired at a reasonable market yield and will allow for payments of net cash flow to the Tenants in Common of 7.0% on invested capital in the first year of operation. However, we cannot give any assurance that each payment will be made or that the Property will operate profitability" (Ex. "8", p.93). |
| **Alleged Misrepresentation/Omission:** Defendants failed to warn Plaintiff that she was "investing in jurisdictions that adopted non-judicial foreclosure laws, which would make the foreclosure process considerably more difficult to defend" (Compl. at ¶38). |

---

[20] Many of the alleged misrepresentations and omissions are contradicted multiple times throughout the offering materials. In the interest of brevity, Defendants provide a few examples here and attach the offering materials in their entirety for reference.

**Response:** As an initial matter, this purported omission is immaterial absent an allegation by Plaintiff that her injury was caused by the fact that the lender pursued non-judicial rather than judicial foreclosure.[21] There is no dispute that several of the properties defaulted and that the lenders were entitled to foreclose. It is further immaterial in that non-judicial foreclosure today is the norm, not the exception.[22] In any event, the PPMs clearly disclosed the possibility of a non-judicial foreclosure:

"Notwithstanding any other provision of this Agreement, the Asset Manager will not receive a fee under this Section 9.5 upon the foreclosure, *deed in lieu of foreclosure or other similar acquisition of the Property by the Lender*" (Ex. "8", p.10).

Moreover, Plaintiff was provided with a copy of the loan documents prior to the closing of the transactions. See Exhibit "14" at p.__ ("If Griffin Capital (Ashwood-Southfield) Investors, LLC determines that a prospective Purchaser of the Interests meets the qualifications to participate in the acquisition of an Interest and elects to sell an Interest to a prospective Purchaser, Griffin Capital (Ashwood-Southfield) Investors, LLC will forward to the prospective Purchaser closing documentation and instructions for the acquisition of the Interest. This documentation will include the Loan documents.").

Further, Plaintiff executed a Tenants In Common Agreement wherein she expressly approved the loan documents: "Each Tenant in Common hereby

---

[21] "To be actionable, the alleged misrepresentations must be 'material.' A fact is 'material' if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision. *Sec. & Exch. Comm'n v. Washington Cty. Util. Dist.*, 676 F.2d 218 (6th Cir. 1982). Whether or not the misrepresented or omitted fact is important turns on objective determination of whether a reasonable investor would regard it as significantly altering the total mix of information made available to him. *Austin v. Loftsgaarden*, 675 F.2d 168, 176 (8th Cir. 1982)." *Platsis* at 1293.

[22] Bryan E. Meek, *Mortgage Foreclosure Proceedings: Where We Have Been and Where We Need to Go*, 48 Akron L. Rev. 129, 147 (2015).

approves the acquisition of the Property and documents related thereto, as well as the Loan and Loan Documents." Exhibit "18".[23] These loan documents clearly reflect that the loan was subject to non-judicial foreclosure: "Lender may institute a proceeding or proceedings, judicial or nonjudicial, by advertisement or otherwise, for the complete or partial foreclosure of this Security Instrument or the complete or partial sale of the Property under power of sale or under any applicable provision of law." Exhibit "19".[24]

Accordingly, Plaintiff was clearly informed of the possibility of non-judicial foreclosure in the event of a default on the mortgage. Again, where Plaintiff's allegations are contradicted by documents referenced in or attached to the Complaint, the document trumps the allegation. *Kayser, supra.*

**Alleged Misrepresentation/Omission:** Defendants failed to warn Plaintiff that she could be "responsible for capital calls in the event the properties cannot meet cash need (sic)" (Compl. at ¶38).

**Response:** The risk of capital calls was clearly and repeatedly disclosed: "Defaults by tenants could result in a significant reduction in rental revenues, which could require the Tenants in Common to contribute additional capital or obtain alternative financing to meet obligations under the Loan" (Ex. "7", p.7).

"The Tenants in Common Agreement requires each Tenant in Common to contribute its pro rata share of all funds needed to cover shortfalls in operating expenses and capital expenditures and to indemnify each other for any failure to contribute their pro rata share, with interest thereon at a rate of 10%" (Ex. "7", p.11).

**Alleged Misrepresentation/Omission:** Defendants failed to warn Plaintiff that the fees and expenses "vitiated the potential tax deferral" (Compl. at ¶38).

**Response:** As an initial matter, the amount of taxes deferred as a result of a 1031 exchange transaction is unique to each investor. Sigma, as the selling broker-dealer, has no way of knowing or determining this amount and investors are not

---

[23] A form copy of the Tenants In Common Agreement is included in the Ashwood-Southfield PPM Supplement (Exhibit "8" at p.C-1). A copy of the actual agreement executed by Plaintiff was filed with the Oakland County, Michigan Register of Deeds. Because this document is a public record, it can be considered by the Court in ruling on Defendants' Motion to Dismiss. *Bassett, supra.*

[24] Similarly, the mortgage was also recorded with the county Register of Deeds and thus, is likewise a matter of public record.

requested or required to disclose it. Moreover, the offering materials are replete with warnings of the potential tax consequences, including the possibility that the investment will not qualify for tax deferral, and urge investors to consult their own accountants:

"Do not construe the contents of this Memorandum or any Supplement as legal or tax advice. Consult your own independent counsel, accountant or business advisor as to legal, tax and related matters concerning an investment in Interests. We make no representation or warranty with respect to the acceptance by the Internal Revenue Service ('IRS') or any state taxing authority of your treatment of any item on your tax return or the tax consequences if you are investing in Interests as part of a like-kind exchange under Section 1031 of the Internal Revenue Code of 1986, as amended (the 'Code')" (Ex. "7", p.(i)).

"There are substantial risks associated with the federal tax aspects of a purchase of an Interest, especially if the purchase is part of a Section 1031 Exchange. Moreover, the tax consequences of a purchase of an Interest are complex, and recent tax legislation has made substantial revisions to the Code. Many of these changes affect the tax benefits generally associated with an investment in real estate" (Ex. "7", p.16).

"No opinion will be given regarding the tax treatment of any purchaser of Interests or any particular exchange. You must consult your own tax advisor about an investment in an Interest and the treatment of the transaction under Section 1031 of the Code and applicable state laws" (Ex. "7", p.17).

Further, the offering materials fully disclose all costs and fees associated with the investment (see, e.g., Ex. "8", pp.12-14), allowing Plaintiff to determine whether the potential tax consequences were sufficiently beneficial to her in light of the costs.

**Alleged Misrepresentation/Omission:** Defendants failed to warn Plaintiff of the "tax risks associated with foreclosure" (Compl. at ¶38).

**Response:** Again, the offering materials include numerous warnings to investors about the potential tax consequences of a foreclosure: "If the rental income is not sufficient to make the debt service payments on the Loan, the Lender could elect to exercise its rights under the Loan documents, including foreclosure, potentially leading to a complete loss of investment and adverse tax consequences for the Tenants in Common. In addition, See "Federal Income Tax Consequences - Other Tax Consequences of Ownership of an Interest - Foreclosure" (Ex. "7", p.7).

"If the cash flow from a Property is insufficient to service the debt incurred in connection with the acquisition of such Property, the equity in such Property may be reduced or eliminated through foreclosure, which may have adverse tax consequences for the Tenants in Common Who own Interests in that Property. See "Federal Income Tax Consequences" (Ex. "7", p.11).

"If additional funds are not available from any source, the Tenants in Common may be subject to the risk of losing that Property through foreclosure. Any such foreclosure may have adverse tax consequences for the Tenants in Common. See '"Federal Income Tax Consequences" (Ex. "7", p.11).

"Foreclosure. In the event of a foreclosure of a mortgage or deed of trust on a Property, you would realize gain, if any, in an amount equal to the excess of your share of the outstanding mortgage over your adjusted tax basis in a Property, even though you might realize an economic loss upon such a foreclosure. In addition, you could be required to pay income taxes with respect to such gain even though you receive no cash payments as a result of such foreclosure" (Ex. "7", p.50).

"The Lender may foreclose on the Property upon various Events of Default, including failure to make debt service payments. If a Lender were to foreclose, you would likely lose your entire investment in the Property and suffer adverse tax consequences" (Ex. "8", p.79).

**Alleged Misrepresentation/Omission:** Defendants failed to warn Plaintiff that "the underlying loans for the properties would be securitized and sold on the secondary market" (Compl. at ¶38).

**Response:** This purported omission is utterly immaterial. While the purchaser of a securitized loan bears increased risk, it is of absolutely no consequence to the borrower. Accordingly, this purported omission, even if true (which Plaintiff does not even allege), is insufficient to state a fraud claim. *Platsis, supra at 1283.*

**Alleged Misrepresentation/Omission:** Defendants failed to warn Plaintiff that "the leases and loan documents could be modified without her consent" (Compl. at ¶38).

**Response:** Co-owner consent is different with respect to properties structured as tenants-in-common ("TICs") versus Delaware Statutory Trusts ("DSTs"). Here, three of the four investments were structured as TICs and one (Signature Ridge) was structured as a DST. Investors in Signature Ridge are merely beneficial owners. A Trustee holds title to the property for the owners' benefit. The owners have no direct control over the property whatsoever, as fully disclosed in the PPM:

"Investors have no say in the operation and ownership of the Property.

Nevertheless, prior to entering into a binding contract to sell or convey the Property, the Signatory Trustee will canvass the Investors regarding their views of such potential transaction. The Signatory Trustee will consider the Investors' views and opinions in good faith but will not be bound by their opinions, and the decision to engage in the sale or conveyance of the Property will rest solely with the Signatory Trustee" (Ex. "9", p.11).

"**Form of Ownership**. The Investors will own beneficial interests in a Delaware statutory trust, which owns legal title to the Property. See "SUMMARY OF THE TRUST AGREEMENT." The Investors will have no right to exclusive ownership of any portion of the Property and, pursuant to the Trust Agreement, will have no say in the operation or ownership of the Property" (Ex. "9", pp.33-34).

Clearly, since Plaintiff was informed she would have no say in any aspect of ownership or management of the property, she knew (or should have known) that her consent was not required.

TICs, on the other hand, are treated differently since each investor actually owns a pro rata share of the property. With these investments, the consent of all owners is required for certain actions, including the modification of any lease or loan document. Again, this is made clear in the offering materials:

"Tenants in Common must unanimously . . . approve any lease or refinancing or amendments to any lease or Loan document" (Exhibit "7" at p. 24). Thus, Plaintiff was clearly informed of what she now claims was concealed.

**Alleged Misrepresentation/Omission:** Defendants failed to "advise Plaintiff of the litigation and foreclosure histories of the companies that issued the TICs in question" (Compl. at ¶38).

**Response:** First, this allegation presumes that "the companies that issued the TICs" had a material litigation and foreclosure history at the time of Plaintiff's investment, which Plaintiff does not even allege. Further, two of the PPMs (Golden Triangle and Cabot Drive), affirmatively state that "There are no material legal actions pending against the Manager, the Property Manager or the Company." Absent an allegation that this statement is false, Plaintiff fails to state a claim for fraud.

Second, if this information was material to Plaintiff in making her investment decision, she had an obligation to request it prior to engaging in the transactions. Indeed, each of the PPMs informs Plaintiff of her right to request additional information from the sponsor. See, e.g., Exhibit "8" ("You may ask questions and

receive answers in writing concerning the terms and conditions of the Program or this Offering and you may obtain any additional information, which we may possess, or can acquire without unreasonable effort or expense."). It is simply not reasonable for Plaintiff to claim 11 years later that this information was critical to her investment decision when she failed to even inquire about it at the time. *See, e.g., Platsis, supra* at 1293 ("Plaintiff understood the significance of not having that data. He complained. He got no satisfaction. Yet, he invested anyway. If blame is to be assessed, he has only himself to blame."); *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255 (6th Cir. 2012) ("If a party might have learned the truth by ordinary vigilance and attention, it is the party's own folly if he neglected to do so, and he is remediless.") (internal quotation marks and citation omitted).

**Alleged Misrepresentation/Omission:** Defendants failed to "disclose the identity and creditworthiness of the other individuals and corporations who would own the properties in question with plaintiff" (Compl. at ¶38).

**Response:** Again, this purported omission is contradicted by the written offering materials which contain copies of agreements that Plaintiff executed which identify her fellow investors by name and percentage of ownership. See, e.g., Exhibit "7" at p. C-1 and Exhibit "18." Moreover, Plaintiff was aware by virtue of the subscription process that each of her fellow owners in the properties qualified as an accredited investor under securities rules and was required to submit copies of tax returns, a financial statement, credit check authorization, litigation disclosure, etc., before being approved to invest. See, e.g., Exhibit "14" at p.1 ("This Questionnaire contains (i) an Individual Questionnaire, (ii) an Entity Questionnaire, (iii) Vesting Instructions, (iv) Certificate of Borrower, (v) Credit Authorization Form, (vi) a Broker/Dealer Certificate, and (vii) Privacy Notice for Individual Purchasers. Also included therewith are a series of exhibits including: (i) Credit History Certification; (ii) Financial Statement And Supporting Schedules; (iii) Credit References; (iv) Contingent Liability Certification; and (v) Litigation Disclosure."). Accordingly, Plaintiff knew who her fellow investors were and knew they satisfied minimum investment criteria.

**Alleged Misrepresentation/Omission:** Defendants failed to "warn Plaintiff that the properties could be controlled and dominated by management companies owned by the issuer of the investments" (Compl. at ¶38).

**Response:** Again, the disclosures in the offering materials could not be more clear: "'Griffin Capital,' 'we,' 'us' and 'our' mean Net Lease Investments, Inc. (d/b/a Griffin Capital) and, where the context permits, its affiliates which may provide other services in connection with the offering of Interests and acquisition, financing, management and disposition of the Properties" Exhibit "7" at p.1.

"Net Lease Investments, Inc., a California corporation formed in 1995, which is doing business as Griffin Capital, will act as Sponsor of the Program . . . We will act as the Asset Manager with respect to Properties offered through the Program. In addition, we will form a wholly owned subsidiary to acquire an Interest in and to offer for sale Interests in each Property, and we will manage the offering of the Interests. In addition, we may retain and hold Interests or sell Interests to our affiliates. Accordingly, we may exercise significant influence over matters to be voted upon by the Tenants in Common" Exhibit "7" at pp.1-2.

"The Tenants in Common will enter into an Asset Management Agreement with the Asset Manager. Under the Asset Management Agreement, the Asset Manager is responsible for the oversight and supervision of the Property, including the collection and distribution of rents to creditors and the Tenants in Common and the oversight of day-to-day property management services. We may perform such services or delegate them to third parties" Exhibit "7" at pp.1-2.

"The Asset Manager will have the right to make significant decisions with respect to overseeing and supervising the management and operation of a Property on behalf of the Tenants in Common, subject to tenants' rights under any existing leases relating to the Property. We will act as the initial Asset Manager for each Property offered through the Program. The Asset Manager may also engage our affiliates to act in other capacities, such as arranging financing or providing real estate analysis or brokerage services to the Asset Manager. Under the Asset Management Agreement, the Tenants in Common will provide significant powers to the Asset Manager to oversee and supervise the management of a Property. Accordingly, you should not purchase Interests unless you are willing to entrust us with the management of a Property. Exhibit "7" at p.14.

In addition to the foregoing allegations which Plaintiff claims apply to all four investments, Plaintiff alleges additional misrepresentations or omissions with respect to individual properties. Nonetheless, all are contradicted by the offering materials and therefore cannot form the basis of a fraud claim. For example, with respect to Golden Triangle, Plaintiff alleges that it was a material omission that the actual loan documents were not contained in the offering materials. This omission,

42

however, cannot be material since the absence of the loan documents was obvious and clearly disclosed in the PPM. In other words, Plaintiff knew in 2005 that the loan documents were not included. If this was truly material to her, she should and would have declined to make the investment. More significantly, however, is the fact that the PPM included a summary of the loan terms and informed investors of their right to inspect and approve the loan documents and to rescind the purchase if they had any concerns about their content:

> Buyer . . . shall have had the opportunity to review and approve the final Loan Documents, including, if relevant, the Loan Assumption Documents, and any other documents, instruments, or agreements that are required to be delivered or executed by Buyer in conjunction with the Close of Escrow within three (3) days after receipt of the applicable document.
>
> * * *
>
> Buyer may terminate this Agreement and obtain a return of the good faith deposit and/or earnest money deposit if he receives . . . Loan Documents for the Property or modifications or amendments of any of the Transaction Documents that, in Buyer's sole reasonable discretion, contains information that would have a material adverse impact on the purchase of lnterests by the Buyer.

Exhibit "11", p.B-3. If, after having been informed of her right to inspect the loan documents, Plaintiff failed to do so, the risk falls on her. Her lack of diligence in this regard does not constitute a material omission by Defendants.

With respect to Ashwood-Southfield, Plaintiff claims that the PPM stated that no independent appraisal was obtained by the sponsor. Again, since this fact is

43

clearly stated in the PPM, it is not an omission. Plaintiff claims that because there was no independent appraisal, she relied on a purported representation from Sigma (no particular individual, just "Sigma." Compl. at ¶61) that the properties were valued at $60 million. Even if true, Plaintiff's reliance was wholly unreasonable for two primary reasons. First, Plaintiff represented and warranted when she executed the PA for Ashwood-Southfield that she relied on no information outside the written offering materials. Exhibit "15." Second, the offering materials are replete with information that contradicts any purported $60 million value. For example, the very first page of the Ashwood-Southfield PPM Supplement states that the sponsor acquired the property for $53.1 million. Exhibit "1" at cover page. The Addendum further includes the following:

> We have not obtained an independent appraisal with respect to the value of the Interests being offered. However, to arrange financing the Lender obtained an appraisal of the Property from Cushman & Wakefield. This appraisal indicated that the Property has a stabilized value of $53.4 million, which is slightly higher than the $53.1 purchase price we will pay for the Property. Although, based on our internal valuation of the Property, we believe we have negotiated a fair and equitable purchase price, we cannot provide any assurance as to the current value of the Property or the proceeds that the Tenants in Common could achieve upon a resale or refinancing of the Property. If the purchase price for the Property is higher than its true fair market value, the Interests of the Tenants in Common would be subject to immediate dilution and the Tenants in Common may recover less than their invested capital upon any eventual sale or refinancing of the Property.

44

Exhibit "8" at p.9. Accordingly, there is no reasonable basis for any reliance by Plaintiff on a purported representation that the properties were worth $60 million.

With respect to Cabot Drive, Plaintiff alleges that the PPM contained a description of the market conditions in Baltimore and Cecil County, Maryland despite the fact that Cabot Drive is a suburb of Baltimore and located in a different county. Once again, since this information is clearly disclosed in the PPM, it is not an omission. Indeed, the PPM states:

> The Property is an industrial warehouse building located in the Anne Arundel County submarket of the Baltimore/Washington corridor.
>
> **Market Overview**
>
> The following is the 2004 Midyear Industrial Market Report for Baltimore prepared by Colliers Pinkard.

Exhibit "5" at p.26. Moreover, a map of the area contained on page 30 of the PPM (Exhibit "5") reveals that the property is indeed located in the Baltimore/Washington corridor, regardless of county lines. In any event, if Plaintiff required market information for the specific county in which the property was situated, she should have requested it (Exhibit "5" at p.iii) or, alternatively, declined to make the investment. She cannot claim a decade later that information was material to her decision when the absence of the material was known to her at the time.

With respect to Signature Ridge (referred to in the Complaint as "Medical Drive" the street the property is located on (see Exhibit "9")), Plaintiff claims that she was not informed of the specific risks associated with the DST versus TIC structure. The disclosures in the offering materials contradicting this baseless claim are too numerous to list.  See, e.g., Exhibit "9" at p.36 ("Risk Relating to the Trust Structure").

Similarly, Plaintiff claims that she was told that the Master Tenant to whom the property would be leased was "a highly credit worthy tenant and that it would insulate Plaintiff from market fluctuations." Compl. at 78. First, as to purportedly being "insulated" from "market fluctuations", the PPM states *ad infinitum* that the investment is highly speculative, involves substantial risk and that investors must be prepared to lose their entire investment. See Exhibit "9", *passim*. Second, the PPM directly contradicts any purported claim that the Master Tenant was "highly credit worthy", and in fact reveals the opposite:

> USA Signature Ridge LeaseCo., LLC, a Delaware limited liability company (the "Master Tenant"), is the Master Tenant of the Property. The Master Tenant will be formed in February 2005 to serve as the Master Tenant of the pending transaction. It has no operating history. CBREI/USA and MBS LLC are members of the Master Tenant, of which CBREI/USA owns two-thirds, and MBS LLC owns one-third, of the membership interests therein.

46

Exhibit "9." Thus, aside from attesting that she relied on no outside statements (Exhibit "17"), the PPM specifically contradicts the alleged misrepresentations, making any reliance unreasonable as a matter of law.

Plaintiff's purported reliance is further unreasonable because she warranted in a signed writing that she did not rely on any information, including oral statements by third parties, outside of the offering materials when making her investment decisions. *Whitesell Corp. v. Whirlpool Corp.*, No. 1:05-CV-679, 2009 WL 3327247, at *1 (W.D. Mich. Oct. 13, 2009) ("[T]he no-reliance clause abrogates the reliance element of Plaintiff's fraud claim as a matter of law.").[25]

---

[25] *See also Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1159 (9th Cir. 1996) ("[T]he Investors' contractual representation that they did not rely on any other person goes far to defeat their present claims that they did precisely the opposite and relied on GE Capital."); *San Diego Cty. Employees Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104 (S.D.N.Y. 2010) (finding non-reliance provisions "clear and unequivocal" and concluding that "Plaintiff's purported reliance on statements made before the execution of the Subscription Agreement [is] unreasonable as a matter of law."); *Tirapelli v. Advanced Equities, Inc.*, 351 Ill.App.3d 450, 456 (2004) ("[The] integration and nonreliance clauses in the subscription documents made plaintiffs' reliance ... unreasonable as a matter of law."); *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000) ("A non-reliance clause ... ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication."); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997) ("[W]here a party specifically disclaims reliance upon a representation in a contract, it cannot later assert that it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon.").

**D.    Defendants Are Not the "Makers" of the Statements in the Offering Materials and, Thus, Not Subject to Liability for Same.**

In addition to alleging that Sigma and its agents misled her, Plaintiff also claims that the investment sponsors made misrepresentations and omissions in the offering materials. For example, Plaintiff alleges "The issuers of the investments at issue committed fraud on Plaintiff, [by] making material misrepresentations and/or omissions in the private placement memorandums (sic) for the investments at issue." Compl. at ¶116. Plaintiff further alleges that since Defendants were the ones who transmitted the offering materials to her[26], they are liable for "aiding and abetting" the sponsor's fraud.

Aside from the fact that Plaintiff fails to identify a single material misrepresentation or omission in the offering materials (which itself defeats the claim), this claim fails as a result of the holding of the United States Supreme Court in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011), wherein the Court held that only the *actual makers* of statements in written offering materials can be liable for fraud based thereon. In *Janus*, the plaintiff sought to impose liability for alleged misrepresentations in a prospectus on the issuer's parent company and affiliated investment adviser claiming that they assisted in the preparation of the prospectus

---

[26] This is another fabricated allegation as the sponsors, and not Sigma, provided the offering materials to Plaintiff, but Defendants recognize the presumption in Plaintiff's favor for purposes of the instant motion.

and disseminated the prospectus by making it available on a website. The Court held that those activities did not make the parent company or investment adviser the "maker" of the statements therein as required to impose liability for fraud:

> [T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142–143.

Here, the PPMs make clear on their face that they are the product of the various investment sponsors and not the broker-dealers who subsequently made the investments available to investors. See Exhibits "5"-"11". Neither Sigma nor any of its agents played any role in the preparation of these materials and Plaintiff does not allege otherwise. Accordingly, Defendants are not the makers of any of the statements in the offering materials and cannot be liable to Plaintiff for same. Even if that were not the case, any fraud claim arising from alleged misrepresentations in the offering materials accrued in 2005.

49

### E.   Rydell Is Not Liable as a Control Person Under the New Jersey Uniform Securities Law.

In addition to Plaintiff's common law fraud claims, she further asserts a cause of action under the anti-fraud provisions of the New Jersey Uniform Securities Law (N.J. Stat. Ann. § 49:3-52), and she claims that Rydell is personally liable for these alleged violations because Rydell is purportedly a "control person" under the statute. N.J. Stat. Ann. § 49:3-71.

As an initial matter, it is indisputable that this cause of action is time-barred by the statute's two-year limitations period (N.J. Stat. Ann. § 49:3-71(g)) as any violation necessarily occurred no later than the time of the transactions in 2005. Given the statute's requirement that the misrepresentations and/or omissions be made "in connection with" the sale of securities, any alleged post-investment act falls outside the scope of the statute.

Moreover, control person liability under the statute attaches only where the alleged control person "materially aided" the fraud. N.J. Stat. Ann. § 49:3-71(d). Here, the Complaint includes no allegations of any kind that Rydell had any involvement whatsoever with the transactions at issue let alone "materially aided" another's fraud and, therefore, even if timely asserted, the claim is insufficiently pled.

50

**F.      Defendants Were Not Plaintiff's Fiduciaries.**

Aside from being untimely, Plaintiff's claim for breach of fiduciary duty fails for one basic reason. As a matter of law, neither Sigma nor any of its agents ever served as Plaintiff's fiduciary.

"The elements of a fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages." *Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066, 2015 WL 8759220, at *3 (W.D. Mich. Dec. 14, 2015) (*citing Stephens v. Dixon*, 449 Mich. 531, 536 N.W.2d 755, 758 (1995). "A fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another. However, the placement of trust, confidence, and reliance must be reasonable." *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 43–44, 698 N.W.2d 900, 906 (2005) (citations and internal quotation marks omitted). "A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing." *In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002). A plaintiff "must show more than mere subjective trust." *Id.* at 892.

An ordinary broker-customer relationship is not fiduciary in nature. This issue was explored in detail in *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951 (E.D. Mich. 1978), *aff'd,* 647 F.2d 165 (6th Cir. 1981), wherein the Court held that:

51

> In a non-discretionary account each transaction is viewed singly. In such cases the broker is bound to act in the customer's interest when transacting business for the account; however, all duties to the customer cease when the transaction is closed.
>
> * * *
>
> [T]he broker's responsibility to his customer ceases when the transaction is complete. A broker has no continuing duty to keep abreast of financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments. Although a good broker may choose to perform these services for his customers, he is under no legal obligation to do so.

*Id.* at 952–53.

The *Leib* Court found that a customer-stockbroker relationship becomes fiduciary in nature only where the broker manages the customer's discretionary account (i.e., has the authority to control and direct the investments in the account without the customer's consent) or where the broker has "usurped actual control" over an otherwise non-discretionary account. *Id.* at 954. *See also Mercantile Bank of Michigan v. CLMIA, LLC*, No. 316777, 2015 WL 630259, at *8 (Mich. Ct. App. Feb. 12, 2015), *appeal denied,* 498 Mich. 884, 869 N.W.2d 585 (2015) ("No party has directed this Court to authority indicating that a financial advisor who has no control over a client's money has a fiduciary duty to a client."); *Davis v. Keyes*, 859 F. Supp. 290, 295 (E.D. Mich. 1994) (fact that investor usually followed broker's advice held insufficient to transform relationship into fiduciary).

52

Here, the Complaint alleges no facts giving rise to a fiduciary relationship. Instead, Plaintiff claims that Defendants were her fiduciary solely "by virtue of their membership in FINRA." Compl. at ¶92. That assertion, however, has no basis in law. There is no securities statute, rule or regulation that declares all FINRA members to be fiduciaries of their customers. If such a rule existed, Plaintiff surely would have cited it.[27]

Here, Sigma did not serve as Plaintiff's investment advisor; Sigma never had control or authority over any of Plaintiff's funds or investments; the investments were not held by Sigma or in any Sigma account; Sigma had no ongoing account relationship with Plaintiff after the transactions were consummated; and Sigma had no role whatsoever in the ongoing management or performance of the investments. All of these facts are apparent from the documents attached hereto, which are part of the record or referred to in the Complaint, and therefore proper for this Court's consideration.

Indeed, the Sigma "New Account Application" notes on the top that Plaintiff was applying to engage in "direct business", meaning that she intended to purchase investments directly from the offeror or sponsor and not from Sigma. Exhibit "3."

---

[27] While a new fiduciary rule promulgated by the United States Department of Labor is on the horizon, it does not take effect until April 2017. Further, the rule relates solely to qualified retirement accounts. *See* Definition of the Term "Fiduciary"; Conflict of Interest Rule—Retirement Investment Advice, 81 FR 20946-01.

Moreover, Plaintiff paid for the investments by transmitting funds directly to the investment sponsors; none of her money ever flowed through Sigma or any Sigma account. See, e.g., Exhibit "15" at ¶1.2.1 ("Buyer shall deposit Cash with Griffin Capital."). Further, Sigma was paid a one-time sales commission for brokering the transactions and received no ongoing compensation. See, e.g. Exhibit "7" at cover page) (selling broker-dealers "will receive commissions of a percentage of the gross proceeds from the sale of the Interests.").

Sigma had no ongoing responsibilities for the investments once the transactions closed and, in fact, played no role whatsoever. Again, this is clear from the written offering materials Plaintiff admits to receiving prior to making the investments. Not only is any reference to Sigma completely absent from the PPMs, but the PPMs expressly identify the parties with ongoing responsibility for all aspects of the investments:

> Griffin Capital, will act as Sponsor of the Program . . . We will act as the Asset Manager with respect to Properties offered through the Program. In addition, we will form a wholly owned subsidiary to acquire an Interest in and to offer for sale Interests in each Property, and we will manage the offering of the Interests . . . Accordingly, we may exercise significant influence over matters to be voted upon by the Tenants in Common . . . The Tenants in Common will enter into an Asset Management Agreement with the Asset Manager. Under the Asset Management Agreement, the Asset Manager is responsible for the oversight and supervision of the Property, including the collection and distribution of rents to creditors and the Tenants in Common and the

> oversight of day-to-day property management services . . . [T]he Asset Manager will keep proper and complete records and books of account for a Property and the Tenants in Common . . . The Asset Manager also will prepare and deliver each year to the Tenants in Common an annual budget and operating plan, as well as an annual report setting forth the applicable income and expenses attributable to an Interest.".

Exhibit "7" at pp.1-2, 42.

In sum, Plaintiff's naked assertion of a fiduciary relationship is insufficient to state a claim where it is clearly and repeatedly contradicted by numerous documents referenced in the Complaint. These documents make clear that Sigma served solely as the broker for the transactions and was paid a one-time commission. Sigma was not the seller of the investments, did not hold the investments, and did not manage or control the investments. This claim, like the others, should be dismissed.

### G.    Plaintiff Fails to Allege Facts to Establish Causation.

Last, the Complaint in this matter utterly ignores the required element of loss causation with respect to Plaintiff's fraud-based claims. In the context of securities fraud, the Plaintiff must plead facts to establish both transaction causation and loss causation. "To plead transaction causation, the plaintiff must allege that it would not have invested in the instrument if the defendant had stated truthfully the material facts at the time of sale. To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries."

55

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).

"'[L]oss causation' requires the plaintiff to point to some causal link between the alleged misrepresentations and a concrete decline in the value of the plaintiff's stock. *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 748 (E.D. Mich. 2003), *aff'd sub nom. D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994 (6th Cir. 2005).

"[W]hat securities lawyers call 'loss causation' *is* the standard common law fraud rule (on which see Prosser and Keeton on the Law of Torts § 110, at p. 767 (5th ed. 1984)), merely borrowed for use in federal securities fraud cases. It is more fundamental still; it is an instance of the common law's universal requirement that the tort plaintiff prove causation." *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683–84 (7th Cir. 1990).

In *Bastian,* investors brought RICO, Rule 10b–5, and state law claims against promoters of limited partnership. The Seventh Circuit affirmed the lower court's dismissal of the investors' complaint for failure to state a claim where the investors did not allege loss causation:

> The plaintiffs alleged that they invested in the defendants' limited partnerships because of the defendants' misrepresentations, and that their investment was wiped out. But they suggest no reason why the investment was wiped out. They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one. It happens that 1981 was a peak year for oil prices and that

those prices declined steadily in the succeeding years. U.S. Dept. of Commerce, Bureau of the Census, Statistical Abstract of the United States, 1989, at 677 (tab. 1181). When this happened the profitability of drilling for oil (and gas, which generally is produced with it) in the continental United States plummeted. The costs of obtaining oil and gas from our depleted reservoirs are far higher than the costs in other regions, and drilling for oil and gas is therefore profitable only in times when prices are very high. Suppose that because of the unexpected drop in oil prices after 1981, all or the vast majority of the oil and gas limited partnerships formed in 1981 became worthless. Then it would be highly unlikely that the plaintiffs' loss was due to the defendants' fraud. If the defendants had come clean in their offering memoranda, then we may assume—because the plaintiffs allege, and the case was dismissed on the complaint— that the plaintiffs would not have invested in the defendants' limited partnerships. But there were plenty of other oil and gas limited partnerships they could have invested in. They wanted to invest in oil and gas limited partnerships; they only wanted to be sure that the general partners were honest and competent people. Yet to be honest and competent is not to be gifted with prevision. If the alternative oil and gas limited partnerships to which these plaintiffs would have turned had the defendants leveled with them were also doomed, despite competent and honest management, to become worthless, the plaintiffs were not hurt by the fraud; it affected the place but not the time or amount of their loss.

*Id.* at 684. *See also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769–72 (2d Cir. 1994) ("When factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions . . . FNB's claims fail because it

has not adequately plead facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.").

Here, Plaintiff alleges a number of misrepresentations and omissions. She also alleges that she incurred losses on the investments because they stopped paying distributions and all but one were foreclosed. What Plaintiff fails to do, however, is connect those two elements. In other words, she does not allege that the specific information omitted or misrepresented is what caused the properties to stop paying distributions and fall into foreclosure.

For example, while Plaintiff alleges that she was not informed that the leases and loan documents could be amended without her consent, she does not allege any amendment to a lease or loan document is what caused the distributions to stop or the loans to be foreclosed. Similarly, while Plaintiff alleges that she was not told that the properties could be foreclosed via non-judicial foreclosure, does not allege that the use of a non-judicial versus judicial process is what caused the properties to perform below expectations. Likewise, Plaintiff alleges that she was not informed of the identity or creditworthiness of her fellow investors, but does not allege that the investments failed as a result of another investor's financial woes.

Moreover, it is undeniable (and a fact of which this Court may take judicial notice) that years after Plaintiff's early 2005 investments, this country endured a prolonged economic recession that devastated the real estate market. This

intervening event significantly diminishes the likelihood that Plaintiff's losses were caused by factors other than the recession.

## IV.   CONCLUSION

Plaintiff is a wealthy and sophisticated investor (and, indeed, married to a real estate developer and former financial advisor). She made the investments at issue for the specific purpose of avoiding a substantial tax bill following the sale of prior investment properties. Plaintiff initiated a relationship with Sigma and Mirner because she could not access the type of investments she specifically sought without the assistance of a broker-dealer.

While it is unfortunate that Plaintiff's investments did not perform to her expectations, Plaintiff made the investments following full disclosure of the risks and Plaintiff alone must bear the consequences. She cannot fairly point the finger of blame at Defendants at decade later in an effort to shift liability to Sigma and Rydell after the investment risks she willingly accepted came to fruition. In any event, the Complaint is untimely and facially deficient.

Wherefore, Defendants respectfully request that the Complaint be dismissed with prejudice. Given the expiration of the statutes of limitation, any amendment would be futile.

Dated: September 22, 2016    Respectfully submitted,

SARETSKY HART MICHAELS & GOULD PC
Attorneys for Defendants

By:    /s/Janine M. Lucas
    Gary M. Saretsky P31708
    gsaretsky@saretsky.com
    Janine M. Lucas P66352
    jlucas@saretsky.com
    995 S. Eton
    Birmingham, MI 48009
    (248) 502-3300
    (248) 502-3301 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2016 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: N/A, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:

Jonathan Kurta
Fitapelli Kurta
28 Liberty Street, 30th floor
New York, NY  10005

               /s/ Nancy A. Hoenle
                Nancy A. Hoenle